Sidney N. WHITE, Chapter 13 Trustee for the Estate of Victoria Tevis, Estate of Santina Turner, Estate of Regina Willis, and Estate of Francine Jackman; Victoria Tevis, Individually; Santina Turner, Individually; and Regina Willis, Individually, Appellants,

v.

CHECK HOLDERS, INC.; and Unknown Entities and Individuals, Appellees.

No. 98–SC–739–CL.

Supreme Court of Kentucky.

June 17, 1999.

Rehearing Denied Aug. 26, 1999.

John O. Morgan, Jr., Lexington, KY, Jack L. Block, Bina Sanghavi, Rachelle M. Niedzwiecki, Sachnoff & Weaver Ltd., Chicago, IL, Richard A. Fisher, Logan Thompson Miller, Bilbo Thompson Fisher, PC, Cleveland, TN, for appellants.

Steven L. Beshear, J. Clarke Keller, Daniel E. Danford, Stites & Harbison, Lexington, KY, Paul Markgraf, Ft. Mitchell, KY, for appellees.

J. Rick Jones, General Counsel, Robert B. Barnes, Counsel, Department of Financial Institutions, Frankfort, KY, for Amicus Curiae, Kentucky Department of Financial Institutions.

Barbara B. Edelman, Dinsmore & Shohl LLP, Lexington, KY, for Amicus Curiae, Kentucky Deferred Deposit Association.

LAMBERT, Justice.

■ Pursuant to CR 76.37(1), this Court granted the certification request of the United States District Court for the Eastern District of Kentucky to answer the following question of law:

> When a check cashing company licensed under KRS 368 *et seq.* accepts and defers deposit on a check pursuant to an agreement with the maker of the check, is the service fee charged by the check cashing company a "service fee" and not "interest" under KRS 368 .100(2), or is the fee "interest" which is subject to the usury laws and disclosure provisions in KRS Chapter 360?

To resolve this issue of first impression, we must determine whether the General Assembly intended KRS 368.100(2) to encompass short-term loans based upon deferred deposit transactions as well as check cashing from current funds.

In 1992 the General Assembly enacted KRS Chapter 368. The 1992 Act required check cashing businesses to be licensed by the Department of Financial Institutions (DFI), KRS 368.020–.050, and allowed them to charge a fee for cashing checks without implicating Kentucky's usury laws. As stated in KRS 368.100(2):

> Any fee charged by a licensee for cashing a check shall be disclosed in writing to the bearer of the check prior to cashing the check, and the fee shall be deemed a service fee and not interest.

While the Act clearly applies to check cashing businesses charging fees that might be otherwise considered discounted interest, *see Hamilton v. York*, 987 F.Supp. 953, 956 (E.D.Ky.1997), it is claimed to apply also to fees charged on short-term loans made by the check cashing licensee. Notably absent from this statutory text, however, is any language directly permitting check cashing businesses to advance funds and charge fees for holding checks, thus providing consumers with short-term loans. Rather, the 1992 Act simply permits check cashing by licensees for a fee providing the fee is disclosed to the drawer.

While the terms of KRS 368.100(2) are not ambiguous, the nature of the transactions at issue here may lead to uncertainty in the statute's application. The source of the uncertainty is the use of an order instrument which is "payable on demand and drawn on a bank" (KRS 355.3–104(6)(a)) to evidence a promise of an indebtedness due at some later time. *See* KRS 355.3–104(5). Thus, in an abundance of caution, we will resort to rules of statutory construction to supplement our analysis.

■ This Court's duty in construing statutes is to ascertain and give effect to the intent of the General Assembly. *Beckham v. Board of Education*, Ky., 873 S.W.2d 575, 577 (1994). When the words of a statute "are clear and unambiguous and express the legislative intent, there is no room for construction or interpretation and the statute must be given its effect as written." *McCracken County Fiscal Court v. Graves*, Ky., 885 S.W.2d 307, 309 (1994). However, where statutory language is unclear or the intent of the General Assembly cannot be discerned from the face of the statute, we look for guidance to outside sources, such as legislative history. *Newberg v. Wright*, Ky., 824 S.W.2d 843, 845 (1992). Thus, to deter-

mine whether the General Assembly intended to bring deferred deposit service transactions and loans under the purview of the 1992 Act, we turn to legislative history, administrative construction, relevant case law, and the 1998 statutory amendments enacted by the General Assembly in response to *Hamilton v. York,* 987 F.Supp. 953 (1997).

Legislative history reveals that the purpose of the 1992 Act, as explained by one of its sponsors, was to prevent check cashing companies from charging unreasonably high fees to cash payroll checks for unbanked military personnel and to prevent money laundering. Statement of Senator Smith, Third Reading and Vote on HB 747 before the Full Senate, Videotape 50–VVD2 (March 27, 1992), Kentucky Department for Libraries and Archives, Archives Video Vault; 1992 *Leg. Record* House Bill 747 (May 4, 1992), p. 157; *see also Hamilton v. York,* 987 F.Supp. 953, 956 (1997) (noting that, under the 1992 Act, check cashing businesses were authorized to charge fees to cash checks for unbanked people). House Bill 747 was passed without amendment, unanimously in both the House and Senate. 1992 *Leg. Record* House Bill 747 (May 4, 1992), p. 157. Similarly, its companion bill, Senate Bill 311, passed without amendment in the Senate and the House. 1992 *Leg. Record* Senate Bill 311 (May 4, 1992), p. 47–48. The absence of amendments indicates that the sponsors' assessment of the purpose of the 1992 Act was accurate. Thus, we conclude that the intent supporting the 1992 Act was to regulate check cashing services and to prevent money laundering.

The Department of Financial Institutions' (DFI's) interpretation of the 1992 Act is unclear. On the one hand, DFI is authorized to license deferred deposit service businesses under the 1992 Act. KRS 368.050–.080. On the other, DFI failed to promulgate any regulations for the enforcement of Chapter 368 as authorized by KRS 368.090. Significantly, DFI did not interpret the statutory terms "interest" and "fees" in a cohesive regulatory scheme. It also failed to set maximum check-cashing fees. It did not specify how many times a consumer's short-term loan payment on a check deferred for presentment could be delayed or "rolled over," nor did it set maximum fees for "roll over" transactions. Finally, DFI did not determine whether deferred deposit businesses could prosecute drawers for issuing worthless checks after having agreed to advance money and defer deposit of checks the payees knew were worthless. *Cf.* KRS 514.040(1)(e) (which states that a person is guilty of theft by deception when he intentionally issues or passes a check or similar sight order for the payment of money, knowing that it will not be honored by the drawee).

Regardless of the lack of administrative regulation by DFI, in applying the statute from 1992 to 1998, DFI implicitly construed the Act to include deferred deposit businesses because DFI licensed them to operate. It is a general rule that a "construction of a law or regulation by officers of an agency continued without interruption for a long period of time is entitled to controlling weight." *Hagan v. Farris,* Ky., 807 S.W.2d 488, 490 (1991)(*citing Barnes v. Department of Revenue,* Ky., 575 S.W.2d 169 (1978)). However, this Court limits the deference shown to informal agency interpretations that have been arrived at without rulemaking or an adversarial proceeding. *See Delta Air Lines v. Commonwealth,* Ky., 689 S.W.2d 14, 20 (1985) (holding that "an administrative construction arrived at in an uncontested nonadversarial proceeding is not entitled to great weight"). As noted, DFI did not promulgate regulations. Nor did it formally construe the 1992 Act by any adjudicative procedure. Therefore, we do not give DFI's informal interpretation of the 1992 Act any significant weight.

To conclude our analysis of the 1992 Act, we look to *Hamilton v. York,* 987 F.Supp. 953 (E.D. Kentucky 1997), and the statutory changes that followed. In *Hamilton,* consumers asserted that a deferred depos-

it business, by charging usurious interest for short-term loans on checks deferred for presentment, violated several state and federal statutes, including Kentucky's laws against charging usurious interest. *Id.* at 955–58. The deferred deposit company argued that the 1992 Act permitted the short-term loans and exempted fees charged for the loans from Kentucky's usury statutes. *Id.* at 956. After reviewing the evidence, including the affidavit of DFI's general counsel—which espoused the same agency interpretation discussed above, the court found that the 1992 Act authorized only the operation of check cashing companies. In its holding, the court noted the distinction between interest and service fees:

> KRS 368.100(2) was written so there would be no confusion that if a person walked into a check cashing establishment with a government check for $1,000 and the business gave him $900 for the check that the business would not be subject to usury statues because the $100 payment would be a service fee, not discounted interest. The ... $100 charge is considered a service fee because the business is not receiving the $100 for the use of its money, but rather the service of processing and providing instant cash to unbanked people.

*Id.; see also Miller v. HLT Check Exchange,* 215 B.R. 970, 974 (Bkrtcy.E.D.Ky. 1997) (holding that disbursing funds on the promise of repayment of the sum plus the 'service charge' at a later time is an extension of credit, not check cashing). Furthermore, in *Hamilton* the court hypothesized that if the company's interpretation of the statute was correct, deferred deposit businesses "would not have to stop with short-term loans [since] they could make long-term loans as long as [the loan was made] under the guise of cashing a check." 987 F.Supp. at 956.

The court challenged the Kentucky General Assembly to amend KRS Chapter 368 if the legislature wanted to include deferred deposit businesses within the purview of the statute. *Id.* at n. 7. Almost immediately, the General Assembly enact-ed House Bill 266. According to one of the bill's sponsors, its purpose was to regulate deferred deposit check cashing businesses for the first time. See Statement of Representative Jack Coleman, Reading and Vote on HB 226 Before the Full House, Videotape—February 11, 1998, Legislative Research Commission, Public Information Office. House Bill 226 went through several revisions, but its basic import was never altered by amendment.

The 1998 amendments to KRS Chapter 368 demonstrate that the General Assembly intended, for the first time, to bring deferred deposit service businesses under the governance of KRS Chapter 368 and the regulatory authority of DFI. For the first time, the General Assembly defined deferred deposit service businesses, KRS 368.020, and included them in the statute:

> Except as provided in KRS 368.030, no person shall engage in the business of cashing checks *or accepting deferred deposit transactions* for a fee or other consideration without having first obtained a license.

1998 Ky.Acts ch. 601, s. 2 (amending KRS 368.020, amendment emphasized). The phrases "cashing checks" and "accepting deferred deposit transactions" are separated in the statute by the disjunctive word "or," indicating that the statute covers two types of businesses, not one. Furthermore, had the phrase "the business of cashing checks" in the 1992 Act applied to deferred deposit businesses, there would have been no need for the General Assembly to have amended the statute to include deferred deposit businesses.

With enactment of the 1998 amendments, the General Assembly added many requirements specific to deferred deposit transactions. House Bill 226 mandated written agreements between deferred deposit service businesses and their customers. KRS 368.100(14). It capped the amount of fees any check cashing business could charge and banned for-fee "rollover" transactions by deferred deposit service businesses. KRS 368.100(2), KRS

368.100(15). It limited the time a deferred deposit transaction could be outstanding and limited the amount of money customers could borrow. KRS 368.100(13), KRS 368 .090(1), KRS 368.100(11). Finally, House Bill 266 prohibited deferred deposit service business from prosecuting customers for worthless checks. KRS 368.100(17)–(18). In summary, the 1998 Act drew a definite distinction between check-cashing services regulated in the 1992 Act and deferred deposit transactions.

From the foregoing, it is clear that the 1992 Act did not embrace deferred deposit transactions. Accordingly, a deferred deposit business is not, by virtue of KRS 368.100(2), exempt from the application of other laws, including usury laws and disclosure provisions contained in KRS Chapter 360.

The law of Kentucky is so certified to the United States District Court for the Eastern District of Kentucky.

COOPER, GRAVES, KELLER, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

STUMBO, J., not sitting.