827 So.2d 294 (2002)
Wendy BETTS and John Cardegna, Appellants,
v.
ACE CASH EXPRESS, INC. and Check Express, Inc., Appellees.
No. 5D01-2017.
District Court of Appeal of Florida, Fifth District.
August 30, 2002.
Rehearing Denied October 16, 2002.
*295 John R. Newcomer and Christopher C. Casper of James, Hoyer, Newcomer & Smiljanich, P.A., Tampa and E. Clayton Yates of Law Office of E. Clayton Yates, Fort Pierce, for Appellants.
Neal A. Sivyer and Paul D. Watson of Bush, Ross Gardner, Warren & Rudy, P.A., Tampa, for Appellees.
Robert A. Butterworth, Attorney General, Tallahassee, and Thomas E. Warner, Solicitor General, Matthew J. Conigliaro, Deputy Solicitor General, Louis F. Hubener and Roger B. Handberg, Assistant Attorney Generals, Tallahassee, Amicus Curiae, for State of Florida.
PETERSON, J.
Wendy Betts and John Cardegna[1] appeal an order dismissing with prejudice their third amended class action complaint[2] against defendants, Ace Cash Express, Inc., Check Express, Inc. and other "unknown defendants." The Plaintiffs contend that the trial court erred by finding that the transactions between themselves and the Defendants were legally permitted as check cashing activity authorized by section 560.309(4)(c), Florida Statutes, and that these same transactions did not violate Florida's usury laws.
The underlying facts alleged in the complaint are summarized as follows: Plaintiff visited Defendant's business establishment and would write a check for $120 (as an example). Defendant paid cash to Plaintiff in the amount of $107.50. The difference of $12.50 represented Defendant's fee. Defendant also agreed with Plaintiff that the check would not be deposited for a period of two weeks. Within the two week period, Plaintiff would return to Defendant and deliver a new check to Defendant in exchange for the original check and pay an additional $12.50. This procedure was repeated in successive two week periods for over a year and Defendant allegedly encouraged Plaintiff to deliver a new check and pay the fee every two weeks rather than having Defendant deposit the check or having Plaintiff redeem the check with cash. At one point, Plaintiff increased the amount of her check to $175.00 and paid an increased fee of $23.00. Finally, Defendant would no longer accept a new check and deposited the last one given to it. When the check was dishonored by the *296 drawee bank, Defendant advised Plaintiff that it would invoke sanctions under Florida's bad check law and imposed a fee for the returned check. No allegation was made that this latter fee nor the dishonored check was ever paid by Plaintiff, nor that sanctions were invoked.
The Plaintiffs made several allegations including: (1) the transactions constitute a loan and the fees charged were interest payments that exceeded the lawful rate in violation of Florida's usury statute; (2) the Defendants were not licensed to make consumer loans in an amount less than $25,000 in violation of section 516.01, Florida Statutes, et seq.;[3] and (3) Defendants were engaged in false, misleading and deceptive advertising by making statements that it was engaged in a lawful check cashing service when it was actually engaged in the illegal consumer loan business and thereby violated the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes.
The Defendants contend that the transactions were authorized by Chapter 560, Florida Statutes, and that all charges constituted fees specified by the statutes. We find support for Defendants' position. Section 560.309(4)(a)-(c), Florida Statutes (2000) provides:
(4) Exclusive of the direct costs of verification which shall be established by department rule, no check casher shall:
(a) Charge fees, except as otherwise provided by this part, in excess of 5 percent of the face amount of the payment instrument, or 6 percent without the provision of identification, or $5, whichever is greater;
(b) Charge fees in excess of 3 percent of the face amount of the payment instrument, or 4 percent without the provision of identification, or $5, whichever is greater, if such payment instrument is the payment of any kind of state public assistance or federal social security benefit payable to the bearer of such payment instrument; or
(c) Charge fees for personal checks or money orders in excess of 10 percent of the face amount of those payment instruments, or $5, whichever is greater.
Additionally, the Florida Department of Banking and Finance (Department) promulgated a rule capping the verification fee mentioned in section 560.309(4). Rule 3C-560.801(i), Florida Administrative Code, provides:
In addition to the fees established in Section 560.309(4), F.S., a check casher may collect the direct costs associated with verifying a payment instrument holder's identity, residence, employment, credit history, account status, or other necessary information prior to cashing the payment instrument. Such verification fee shall be collected only when verification is required and shall not exceed $5.00 per transaction. For example, a check casher shall not charge a customer more than (1) verification fee per diem, regardless of whether the check casher is cashing or has cashed more than one (1) of the customer's payment instruments that day.
The Plaintiffs have not alleged that the Defendants charged amounts in excess of those authorized fees, but does characterize the fees as illegal interest.
*297 The Plaintiffs opine that the initial transaction was actually a loan rather than a check cashing transaction because the Defendants agreed to defer the deposit of the check for two weeks and Chapter 560 does not authorize such a deferral. Chapter 560, however, contains no requirements for the disposition of checks after receipt by the Defendants. As in any other business transaction, the Defendants were free to do whatever they desired with the check after receiving it subject only to the deferral agreement with the Plaintiffs.
The Florida Check Cashiers Association (FCCA), apparently concerned about agreements with customers to defer deposits of checks, requested an opinion that was issued by the Department on February 24, 1995:
It is the position of the FCCA that member stores may cash checks for customers and defer the deposit of those checks for a reasonable period of time, mutually agreed upon between the store and the customer, provided that the fee charged for cashing these checks shall not exceed the statutory fee allowable for the specific type of check cashed. The service will be referred to as deferred deposit.
Since Chapter 560, Florida Statutes, does not explicitly prohibit the concept of deferred deposits and since all other provisions of Chapter 560, Florida Statutes, would be adhered to, I see no reason to object to your offering of the above described services. Again, this analysis is based upon the fact that the deferred deposit service will be offered and managed pursuant to the provisions of Chapter 560, Florida Statutes, and specifically within the fee caps contained within Section 560.309(4), Florida Statutes.
We also note that deferred deposit transactions were considered by the 2001 legislature. On October 1, 2001, sections 560.401-408, Florida Statutes, the "Deferred Presentment Act" (Act) became effective. The Act specifically allows "deferred presentment transactions" and defines them in section 560.402(6):
"Deferred presentment transaction" means providing currency or a payment instrument in exchange for a person's check and agreeing to hold that person's check for a period of time prior to presentment, deposit, or redemption.
The Act eliminates "rollovers" described in section 560.402(8):
"Rollover" means the termination of extension of an existing deferred presentment agreement by the payment of any additional fee and the continued holding of the check, or the substitution of a new check drawn by the drawer pursuant to a new deferred presentment agreement.
After considering the Department's advisory opinion solicited by the FCCA in advance of any deferred presentment transactions between the Plaintiffs and the Defendants, the subsequent authorization of the practice by the Florida Legislature, and the absence of any prohibition against the practice in the interim we disagree with the Plaintiffs' characterization of the initial transaction as a loan. See State v. Cotton, 769 So.2d 345, 349 (Fla.2000) (later statutory amendment is clarification of legislative intent).
A determination that deferred presentment transactions are not loans does not end the inquiry. We must also consider the effect of each of the new transactions that took place after the initial transaction.[4] The Plaintiffs allege that they were solicited and encouraged to write a new check at the end of each *298 redemption period and to pay the additional fee. It appears to us that the parties' options at the end of each redemption period were that the Defendants could deposit a check for payment, or the Plaintiffs could redeem the check. If the Defendants deposited the check for payment, and the Plaintiffs had insufficient funds in their respective account at the drawee bank, the consequences of a dishonored check would be imposed upon the Plaintiffs, the Defendants and the drawee bank. If the Plaintiffs had the funds on deposit with the drawee bank it is doubtful that they would have authorized the costly "rollover" of the initial transaction unless they had another use for those funds.
If the Plaintiffs wished to redeem the initial check rather than allow the Defendants to deposit it, they would either have to pay the Defendants in cash or deliver still another check that would be honored in a timely fashion. If they had no cash, they would be required to obtain it in some manner and apparently found that their easiest practical source was the Defendants. The allegation that the Defendants encouraged them to use their services rather than another source seems irrelevant to us. Solicitations are a way of life in the business world. Their choice to again use the Defendants to satisfy their initial obligation that was voluntarily entered was theirs to make. They would again write a check to redeem the original check, would pay the check cashing fee and was assured that the deposit of the replacement check would be deferred. Whether the replacement check was delivered in return for the actual receipt of the face amount and the cash in turn paid back to the Defendants to redeem the earlier check (plus those fees authorized by Chapter 506) seems unimportant and unnecessarily ritualistic. The Florida Attorney General finds that it is important that the cash was actually and physically transferred from the Defendants to the Plaintiffs. Section 506.103(3) is cited for the requirement that a check casher must sell, issue, provide or deliver the coin and paper money of the United States in exchange for the check. Although the Plaintiffs have not alleged that the ritual that the Attorney General would require was not followed, in our view there is no practical difference between the ritualistic extended transaction and an abbreviated one in which only the fee accompanied the delivery of the new check.
The Attorney General refers to multiple forms of check cashing transactions using post-dated checks, extending the time of the deferred deposit of the original checks and requiring payment of cash by the customer to redeem the old check before a new check is cashed. We decline the invitation to review the various ways in which the transactions could take place and review only the transactions contained in the Plaintiffs' third amended complaint and considered by the trial judge.
Notwithstanding, we acknowledge the Attorney General is appropriately concerned about the financial impact upon those who must rely upon Chapter 560 check cashers as a source of funds. The explosive growth of the industry is indicative of the scarcity of resources available for financial assistance to those in dire need and least able to afford the high cost of the assistance.[5] It may also be indicative *299 of a lucrative business venture by those who are willing to invest their capital in transactions involving a high risk of non-payment. The Legislature has made it possible for both sides of the deferred presentments transaction to engage in the economic exercise of supply and demand and has begun the job of fine tuning the statutory scheme with the Deferred Presentment Act. It is apparent that the policy of this state is to find workable restrictions for an originally broad statute without drying up the well for those who are in need of financial assistance even though it may be an expensive source.
We affirm the trial court's dismissal of the third amended complaint.
AFFIRMED.
COBB, J., concurs.
GRIFFIN, J., dissents with opinion.
GRIFFIN, J., dissenting.
I respectfully dissent because I agree with the position espoused by the Attorney General. As structured, these transactions are transparently extensions of credit. The fact that Chapter 560, which regulates check cashing operations, does not expressly prohibit rollovers and deferred presentments, does not mean that the usury laws are not violated by such devices. The legislature is to be forgiven for not having the foresight to prohibit or regulate the "uncashing" of a cashed check. Nor am I persuaded that the passage of the "Deferred Presentment Act" in October 2001 was intended by the legislature to confirm the prior legality of the practice. Indeed, it appears the legislation undertook to regulate and limit these schemes. Further, the statute appears to recognize that these transactions are, in fact, loans.
NOTES
[1] Donna Reuter was also named as a plaintiff for the first time in the third amended complaint and a motion was made to add her as an additional party plaintiff. The motion was not heard nor was she admitted as a party before the complaint was dismissed.
[2] The trial court had not been requested to conclude that the class action was maintainable as required by Florida Rule of Civil Procedure 1.220 prior to the dismissal of the complaint.
[3] It appears the Plaintiffs have abandoned count II of their third amended complaint regarding Florida's Consumer Finance Act, Chapter 516, as no mention is made of this claim in their briefs submitted on appeal.
[4] The Plaintiffs label these subsequent transactions "rollovers."
[5] For an overview on the explosive growth of the payday loan industry, see Lynn Drysdale & Kathleen E. Keest, The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking Abut the Role of Usury Laws in Today's Society, 51. S.C. L.Rev. 589 (2000); Charles A. Bruch, Comment, Taking the Pay Out of Payday Loans: Putting An End to the Usurious and Unconscionable Interest Rates Charged by Payday Lenders, 69 U. Cin. L.Rev. 1257 (2001); and Lisa Blaylock Moss, Commentary, Modern Day Loan Sharking: Deferred Presentment Transactions & The Need for Regulation, 51 Ala. L.Rev. 1725 (2000).