Wendy BETTS, individually and on behalf of others similarly situated, Plaintiffs,

v.

ADVANCE AMERICA, Cash Advance Centers of Florida, Inc. et al., Defendants.

No. 6:99–CV–593–ORL–28JGG.

United States District Court, M.D. Florida, Orlando Division.

Feb. 24, 2003.

See also: 827 So.2d 294.

John Ray Newcomer, Jr., Christopher Craig Casper, James, Hoyer, Newcomer & Smiljanich, P.A., Tampa, FL, E. Clayton Yates, Law Office of E. Clayton Yates, Ft. Pierce, FL, Jimmy Bilbo, Logan, Thompson, Miller, Bilbo, Thompson and Fisher, PC, Richard A. Fisher, Richard Fisher Law Office, Cleveland, TN, R. Kevin Fisher, Law Office of R. Kevin Fisher, Los Angeles, CA, Jack L. Block, Sachnoff & Weaver, Ltd.,

Chicago, IL, Michael C. Addison, Addison & Delano, P.A., Tampa, FL, for plaintiffs.

J. Thomas Cardwell, Virginia B. Townes, Akerman, Senterfitt & Eidson, P.A., Orlando, FL, for defendants.

## ORDER

ANTOON, District Judge.

On February 25, 2000 Wendy Betts ("Plaintiff") filed a second amended complaint [1] (Doc. 56) containing the following six counts against Defendants Advance America, Cash Advance Centers of Florida, Inc. ("Advance America"), Steve A. McKenzie ("Mr. McKenzie"), George R. Johnson, Jr. ("Mr. Johnson"), and Advance America, Cash Advance Centers, Inc. ("AACA") (collectively "Defendants"): Count I alleges that Defendants violated Florida's Lending Practices Act, Chapter 687, Florida Statutes; Count II alleges that Defendants violated Florida's Consumer Finance Act, Chapter 516, Florida Statutes; Count III alleges that Defendants violated Florida's Deceptive and Unfair Trade Practices Act, Chapter 501, Consumer Protection Part II, Florida Statutes; Count IV alleges that Defendants engaged in a fraudulent scheme, artifice and device to extract usurious sums and exorbitant charges through knowing, intentional and willful misrepresentations; Count V alleges that Defendants violated Florida's Civil Remedies for Criminal Practices Act, Chapter 772, Florida Statutes; and Count VI alleges that Defendants violated the Federal Racketeer Influenced and Corrupt Organization Act, ("RICO") 18 U.S.C. § 1961 et seq.

In response to Plaintiff's complaint, Defendants filed a Motion for Summary Judgment on July 19, 2000 (Doc. 73). On November 21, 2000 Magistrate Judge Glazebrook heard Advance America's summary judgment motion and Plaintiff's motion for class certification (Doc. 62). A Report and Recommendation was subsequently issued on January 31, 2001 (Doc. 102) recommending that Defendants' Motion for Summary Judgment be granted and Plaintiff's Motion for Class Certification be denied. Although Magistrate Judge Gla-

zebrook found that the relevant deferred deposit transactions were indeed loans subject to usury laws, the Magistrate Judge also concluded that Advance America fully complied with the law while engaging in these transactions. This Court adopts the Report and Recommendation only to the extent that it comports with the recent decision in *Betts v. Ace Cash Express, Inc.*, 827 So.2d 294 (Fla. 5th DCA 2002).

### I. *Factual Background*

This case involves a series of business transactions between Plaintiff and Advance America. Advance America is engaged in the business of cashing checks and is licensed to conduct such transactions by the Florida Department of Banking and Finance. More significantly, Advance America conducts deferred deposit transactions where Advance America accepts and cashes personal checks, which may be postdated by up to fourteen days. In other words, in exchange for a postdated check, Advance America gives a customer cash in an amount that reflects a 10% deduction and a $5.00 verification fee. Customers then have the option of repurchasing the postdated check or may take no action, thereby allowing Advance America to deposit the postdated check after the fourteen-day period. Because Defendants defer deposit of checks for up to two weeks, Plaintiff opines that this type of transaction constitutes a loan subject to state usury laws. Defendants, on the other hand, contend that deferred deposit transactions are not loans but are merely check-cashing transactions. Essentially, this Court is asked to determine the legality of deferred deposit transactions.

### II. *Procedural Background*

Pursuant to *Florida Marine Fisheries Commission v. Pringle*, 736 So.2d 17 (Fla. 1st DCA 1999), this Court stayed the instant case on May 29, 2001 pending resolution of Plaintiff's administrative challenge of Administrative Rule 3C–560.803, which deals with the legality of charging fees for deferred deposit transactions. (Doc. 114). On August 30, 2002 the Fifth District Court of Appeal of

---

1. By order dated February 25, 2000, Magistrate Judge James G. Glazebrook granted Plaintiff's

motion for leave to file a second amended complaint.

Florida issued the decision in *Betts v. Ace Cash Express, Inc.*, 827 So.2d 294 (Fla. 5th DCA 2002). The *Betts* court held that deferred deposit transactions are check-cashing transactions rather than loans subject to state usury laws.

In light of the *Betts* decision, Defendants filed a renewed motion to lift the stay in the instant case. (Doc. 134, filed December 6, 2002). The parties also filed supplemental memoranda discussing the significance of the opinion issued by the Fifth District Court of Appeal. Defendants argue that the *Betts* decision is controlling authority and disposes of Plaintiff's current claim against Defendants. Plaintiff, however, argues that the transactions in this case can be distinguished from those examined in the *Betts* opinion and therefore, *Betts* is not controlling authority. By order dated January 23, 2003 this Court granted Defendants' renewed motion and lifted the stay. (Doc. 136).

## III. *Legal Analysis*

### A. *Summary Judgment Standards*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. At the summary judgment stage, "[t]he function of the court is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial.'" *Lockett v. Wal–Mart Stores, Inc.*, No. Civ. A. 99–0247–CB–C, 2000 WL 284295, at *2 (S.D.Ala. Mar. 8, 2000) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505).

### B. *Merits of Defendants' Motion*

#### 1. *Deferred deposit transactions are check cashing transactions and are not loans subject to state usury laws.*

■ Plaintiff argues that Defendants' practice of engaging in deferred deposit transactions is unlawful because it constitutes usurious lending. The facts in the *Betts* case are quite similar to those in the instant matter.

The underlying facts alleged [in *Betts*] are summarized as follows: Plaintiff visited Defendant's business establishment and would write a check for $120 (as an example). Defendant paid cash to Plaintiff in the amount of $107.50. The difference of $12.50 represented Defendant's fee. Defendant also agreed with Plaintiff that the check would not be deposited for a period of two weeks. Within the two week period, Plaintiff would return to Defendant and deliver a new check to Defendant in exchange for the original check and pay an additional $12.50. This procedure was repeated in successive two week periods for over a year and Defendant allegedly encouraged Plaintiff to deliver a new check and pay the fee every two weeks rather than having Defendant deposit the check with cash.

*Betts*, 827 So.2d at 295. Clearly, the facts in *Betts* are identical to those alleged in the instant case. Here the Plaintiff tendered a check to Advance America in exchange for cash and also had the option to either redeem the check or allow the check to be deposited. Similarly, Plaintiff was charged a fee by Advanced America for cashing checks and for verification of the customer's financial information. And Plaintiff, in this instance, engaged in these transactions on a bi-weekly basis.

The *Betts* Court partially relied upon the Deferred Presentment Act set forth in section 560.401–408, Florida Statutes in reaching its decision. "The Act specifically allows 'deferred presentment transactions' and defines them in section 560.402(6):

'Deferred presentment transaction' means providing currency or a payment instrument in exchange for a person's check and agreeing to hold that person's check for a period of time prior to presentment, deposit, or redemption."

*Betts*, 827 So.2d at 297. The *Betts* court explains that "[a]fter considering the [Florida] Department [of Banking and Finance's] advisory opinion solicited by the [Florida Check Cashiers Association] in advance of any deferred presentment transactions between the Plaintiffs and the Defendants, the subsequent authorization of the practice by the Florida Legislature, and the absence of any prohibition against the practice in the interim we disagree with the Plaintiff's characterization of the initial transaction as a loan." *Id.*

Like the Defendants in the *Betts* case, Advance America "undertook a concerted effort to ensure that it complied with Florida law and the regulations governing the operation of its business." (Doc. 102 at 12). A representative for Advance America met with members from the Florida Department of Banking and Finance ("the Department") and fully detailed the manner in which it planned to conduct its business in Florida. "By letter dated December 22, 1997, Advance America explicitly stated that '[a]ll the checks to be cashed will be postdated as of the date of the customer's next payday (up to a maximum of 14 days following the date of the transaction).'" (Doc. 102 at 12). Soon thereafter, the Department issued Advance America a license to conduct its business. In light of the Department's authorization of Advance America's deferred deposit transactions, the passage of the Deferred Presentment Act and the factual similarities between the instant matter and the *Betts* case, this

Court finds that the initial transaction between Plaintiff and Advance America did not constitute a loan.

2. *All subsequent transactions between Plaintiff and Advance America are check cashing transactions.*

■ Plaintiff further argues, in the instant matter, that the subsequent transactions between Plaintiff and Advance America constitute a loan. According to Plaintiff, these repeated transactions are essentially "rollover" loans which have been eliminated from the Deferred Presentment Act.[2] The same argument was made in the *Betts* case, and the court concluded that any other subsequent transactions between a customer and check cashing store, by which a customer writes a new check at the end of each redemption period and pays an additional fee, did not transform the transaction into a loan subject to state usury laws. *See Betts*, 827 So.2d at 298.

In reaching its conclusion, the *Betts* court explains "that the parties' options at the end of each redemption period were that the Defendants could deposit a check for payment, or the Plaintiffs could redeem the check." *Id.* at 298. "If the Plaintiffs wished to redeem the initial check rather than allow the Defendants to deposit it, they would either have to pay the Defendants in cash or deliver still another check that would be honored in a timely fashion.... Their choice to again use the Defendants to satisfy their initial obligation that was voluntarily entered was theirs to make." *Id.* The *Betts* court concludes that "there is no practical difference between the ritualistic extended transaction and an abbreviated one in which only the fee accompanied the delivery of the new check." *Id.* Since there are no substantive differences in the nature of the repeated transactions between Plaintiff and Advance America with the subsequent transactions described in the *Betts* case, this Court concludes that the repeated bi-weekly transac-

---

**2.** "Rollover" transactions are defined in the Deferred Presentment Act as follows:

"Rollover" means the termination or extension of an existing deferred presentment agreement by the payment of any additional fee and the continued holding of the check, or the substitution of a new check drawn by the drawer pursuant to a new deferred presentment agreement. § 560.402(8), Fla. Stat.

tions between Plaintiff and Advance America did not transform into loans but remain check cashing transactions.

3. *This Court is bound by the Betts opinion.*

▮ This Court is bound by the decision reached in the *Betts* case. "[T]he rule is that, absent a decision from the state supreme court on an issue of state law, we are bound to follow decisions of the state's intermediate appellate courts unless there is some persuasive indication that the highest court of the state would decide the issue differently." *McMahan v. Toto,* 311 F.3d 1077, 1080 (11th Cir.2002) (citing *Galindo v. ARI Mut. Ins. Co.,* 203 F.3d 771, 775 (11th Cir.2000)). The Florida Supreme Court has opined that " 'the decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court.' " *Pardo v. State of Florida,* 596 So.2d 665, 666 (Fla. 1992) (quoting *Stanfill v. State,* 384 So.2d 141, 143 (Fla.1980)). "Thus, in the absence of interdistrict conflict, district court decisions bind all Florida trial courts." *Pardo,* 596 So.2d at 666 (citing *Weiman v. McHaffie,* 470 So.2d 682, 684 (Fla.1985)). Since Plaintiff has not made any persuasive arguments or presented any evidence indicating that the Florida Supreme Court would decide this issue differently, this Court finds that the initial transactions between Plaintiff and Advance America do not constitute loans subject to state usury laws, but are check cashing transactions. Moreover, any subsequent transactions between Plaintiff and Advance America where Plaintiff wrote a new check at the end of each redemption period and paid an additional fee constitute check cashing transactions.

III. *Conclusion*

In light of the opinion of the Fifth District Court of Appeal in *Betts v. Ace Cash Express, Inc.,* 827 So.2d 294 (Fla. 5th DCA 2002), this Court concludes that the initial transaction and all subsequent transactions between Plaintiff and Advance America are not loans but are rather check cashing transactions. Although this Court does not adopt the recommendation of Magistrate Judge

Glazebrook that the transactions Plaintiff and Advance America constitute a loan, this Court does adopt the Magistrate Judge's findings of fact and ultimate conclusion that Defendant's Motion for Summary Judgment (Doc. 73) should be granted.

Therefore, it is ORDERED as follows:

1. The Report and Recommendation (Doc. 102, filed January 31, 2001) is **ADOPTED** and **CONFIRMED** to the extent that it comports with *Betts v. Ace Cash Express, Inc.,* 827 So.2d 294 (Fla. 5th DCA 2002).

2. The Defendants' Motion for Summary Judgment (Doc. 73, July 19, 2000) is **GRANTED.**

3. All other pending motions are **DENIED as moot.**

4. The Clerk is directed to close the case.

**REPORT AND RECOMMENDATION**

GLAZEBROOK, United States Magistrate Judge.

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for a hearing on November 21, 2000 on the following motions:

**MOTION:** DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Docket No. 73]

**FILED:** July 17, 2000

**RECOMMENDATION: GRANTED**

**MOTION:** PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION [Docket No. 62]

**FILED:** April 25, 2000

**RECOMMENDATION: DENIED**

I. *INTRODUCTION AND PROCEDURAL SETTING*

On April 4, 1999, plaintiff Wendy Betts filed a four count complaint in the Circuit Court of Orange County, Florida. Docket No. 2. The complaint alleged that defendant Advance America, Cash Advance Centers of Florida, Inc. ["Advance America"] violated Betts' rights (and those of similarly situated class members) under the Florida Lending Practices Act [Fla. Stat. Ch. 687], the Florida

Consumer Finance Act [Fla. Stat. Ch. 516], and the Florida Deceptive and Unfair Trade Practices Act [Fla. Stat. Ch. 501], as well as Florida common law. The complaint recited an amount in controversy of more than fifteen thousand dollars. Docket No. 2 at ¶ 6.

By notice dated May 19, 1999, Advance America removed Betts' action to this Court pursuant to 28 U.S.C. § 1441. Docket No. 1. The removal notice predicated this Court's jurisdiction upon diversity of citizenship between the parties.[1] On May 27, 1999, Advance America filed a motion to dismiss the complaint. Docket No. 7. On June 2, 1999, Advance America moved to re-designate this matter a Track 3 case. Docket No. 10. By order dated June 7, 1999, the Honorable Patricia C. Fawsett, United States District Judge, recused herself from consideration of this case. Docket No. 16. This case was reassigned to the Honorable G. Kendall Sharp, United States District Judge. Docket No. 17.

On June 21, 1999, Betts filed an amended complaint that contained additional factual allegations but no new defendants or causes of action. Docket No. 19. By endorsed orders dated June 30, 1999, Judge Sharp denied Advance America's motion to dismiss [Docket No. 7] and granted Advance America's motion to re-designate this matter a Track 3 case. Docket No. 10. On the same date, Advance America filed a motion to dismiss the amended complaint. Judge Sharp denied it on July 22, 1999. Docket No. 20. On August 6, 1999, Advance America filed an answer to the amended complaint. Docket No. 31. On August 31, 1999, Betts filed a motion for class certification. Docket No. 34. On September 3, 1999, the Court entered a Case Management and Scheduling Order. Docket No. 37. The scheduling order addressed (among other issues) motions for summary judgment, and warned that "[f]ailure to oppose any motion for summary judgment may result in judgment for the movant without further proceedings." Docket No. 37 at § 2.A.

On December 1, 1999, Betts moved for leave to file a second amended complaint to add three additional defendants and two additional causes of action (one under the federal Racketeer Influenced and Corrupt Organizations Act ["RICO," 18 U.S.C. § 1961] and one under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. Ch. 772). Docket No. 45. On January 4, 2000, this case was reassigned to the unassigned docket. Docket No. 49. At a hearing on February 24, 2000, the Court granted Betts' motion to file a second amended complaint and denied without prejudice her class certification motion. Docket No. 55. On February 25, 2000, Betts filed her second amended complaint. Docket No. 56. Advance America answered on April 4, 2000. Docket No. 59.

On April 11, 2000, Advance America moved for a stay of Local Rule 4.04(e), which prohibits certain communications with actual and potential members of a class action. Docket No. 60. Advance America had inserted a mandatory arbitration clause in its form customer contract, and asserted that it needed to disclose the present litigation to potential customers in order to obtain their informed consent to mandatory arbitration. On April 25, 2000, Betts filed an amended motion for class certification. Docket No. 62. On April 28, 2000, Betts filed a "Motion for Protective Order Pursuant to Federal Rule of Civil Procedure 23(d)" that requested the Court to declare Advance America's mandatory arbitration clause unenforceable or, alternatively, to "declare void any agreements executed by putative class members since the initiation of this action." Docket No. 64. On June 5, 2000, this case was reassigned to the Honorable John Antoon II, United States District Judge. Docket No. 70.

On July 19, 2000, Advance America filed a motion for summary judgment. Docket No. 73. The motion contained a list of twenty facts that Advance America asserted were undisputed and that entitled Advance America to summary judgment. On July 25, 1999, the Court entered an Amended Case Management and Scheduling Order. Docket No. 77. The amended scheduling order advised the parties as follows regarding motions for summary judgment:

---

1. The notice stated that "[t]he matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and cost." Docket No. 1 at 3.

1. Required Materials—A motion for summary judgment shall be accompanied by a memorandum of law, necessary affidavits, and a concise statement of the material facts as to which the moving party contends there is no genuine issue for trial. Each party opposing a motion for summary judgment shall file and serve, within eleven days after being served with such motion, a legal memorandum with citation of authorities in opposition to the relief requested as required by Local Rule 3.01(b), and shall include necessary affidavits and a concise statement of the material facts as to which the opposing party contends there exists a genuine issue for trial. Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of record supporting each material fact. General references to a deposition are inadequate. Material facts set forth in the statement required to be served by the moving party will be deemed admitted for the purposes of the motion unless controverted by the opposing party's statement.

2. Under Advisement—The Court takes a motion for summary judgment under advisement twenty days from the date it is served, unless the Court orders a different date. Until that date, the party opposing summary judgment may file additional affidavits and exhibits within the purview of Fed.R.Civ.P. 56 in opposition to the motion, but not additional memoranda. Fed.R.Civ.P. 6(d) and 56(c); Local Rule 3.01(b). Unless specifically ordered, the Court will not hold a hearing on the motion. Failure to oppose any motion for summary judgment may result in the entry of a judgment for the movant without further proceedings. *See Milburn v. United States,* 734 F.2d 762, 765 (11th Cir.1984); *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) *(per curiam);* Fed.R.Civ.P. 56(e). All requirements in this order apply to *pro se* litigants as well as to parties represented by counsel.

Docket No. 77 at 4–5. By order dated July 27, 2000, the Court denied Advance Amer-

ica's for a partial stay of Local Rule 4.04(e)[2] and denied without prejudice Betts' motion to judicially void Advance America's new arbitration clause. Docket No. 78. With regard to the latter, the Court observed that "[p]laintiff lacks standing to raise the enforceability of an arbitration agreement she did not execute." Docket No. 78 at 2.

On July 28, 2000, Betts responded to Advance America's summary judgment motion by requesting a continuance to take additional discovery pursuant to Federal Rule of Civil Procedure 56(f). Docket No. 80. Betts acknowledged that "[i]t appears, at least at this point in the litigation, that many, if not all, the underlying material facts are not in dispute, and that the lawsuit will be resolved as a matter of law based on cross-motions for summary judgment," but argued that certain important discovery (including the depositions of newly-added defendants Steve A. McKenzie and George R. Johnson, Jr.) was outstanding. After denying this motion on August 3, 1999 for failure to comply with Local Rule 3.01(g) [Docket No. 81], the Court granted in part and denied in part an amended version of this motion on August 29, 2000. Docket No. 86. The Court's order directed as follows:

> It is FURTHER ORDERED that all parties shall comply with the Amended Case Management and Scheduling Order [Docket No. 77 at 4–5] entered July 25, 2000. The order sets forth the requirements for motions for summary judgment. It is
>
> FURTHER ORDERED that discovery may continue on all issues until July 2, 2001, the discovery deadline set forth in the Amended Case Management and Scheduling Order. Docket No. 77. Discovery pursuant to Fed.R.Civ.P. 56(f) is allowed until the date set in this order for plaintiffs response to defendants' motion for summary judgment. Absent a protective order, defendants shall make every effort to expedite the discovery requested, including the four depositions, in time to permit transcription.
>
> It is FURTHER ORDERED that on or before **October 30, 2000,** lead counsel for

---

**2.** The Court had previously granted this motion on June 19, 2000. Docket No. 71. On Betts'

motion dated June 27, 2000 [Docket No. 72], the Court reconsidered, and vacated, its prior order.

the party opposing summary judgment shall confer in person (and not solely by telephone, correspondence, or facsimile) with lead counsel for the movant in order to maximize the number of undisputed facts and to minimize the number of disputed facts, and shall so certify in the "Statement of Disputed Facts."

FURTHER ORDERED that any party opposing the summary judgment motion shall file and serve a memorandum of law and affidavits in opposition on or before **November 6, 2000**. To the extent that the party opposing the motion for summary judgment disputes any facts asserted in the motion, a separate "Statement of Disputed Facts," with pinpoint citations to the record, shall accompany the memorandum in opposition. The memorandum of law in opposition to the motion for summary judgment shall include citations of the statutes, regulations, rules, Eleventh Circuit case law, and other case law that controls the substantive disposition of the motion. It is FURTHER ORDERED that pursuant to Fed.R.Civ.P. 56(c), as interpreted by the United States Court of Appeals for the Eleventh Circuit, the parties are hereby notified that the Court will take any motion for summary judgment and all materials in support or in opposition to the motion under advisement as of the last day for filing a memorandum in opposition to summary judgment and affidavits as set forth in the preceding paragraph. Failure to oppose the motion for summary judgment may result in judgment for the movant without further proceedings. See *Milburn v. United States*, 734 F.2d 762 (11th Cir.1984); *Griffith v. Wainwright*, 772 F.2d 822 (11th Cir.1985). In the event that the Court determines that oral argument will not aid the Court in determining the motion for summary judgment, the Court will rule without a hearing and cancel the above-noticed hearing. It is

FURTHER ORDERED that the parties must strictly adhere to the above procedures. Further motions to extend time or to alter any requirements set forth in this order or the other rules governing summary judgment motions, including the twenty-page limit for memoranda of law pursuant to the Local Rules, are distinctly disfavored.

Docket No. 86 at 2–3 (emphasis in original).

On November 6, 2000, Betts filed a memorandum in opposition to Advance America's summary judgment motion. Docket No. 91. Despite the Court's the explicit directions in the Court's August 29, 2000 order, Betts did not file with her memorandum (either contemporaneously or subsequently) either a "Statement of Disputed Facts" or a certification that lead counsel for both Betts and Advance America had conferred in person in an effort to maximize the number of undisputed facts and to minimize the number of disputed facts. Instead, Betts concurrently filed her own motion for summary judgment, which stated that "[p]laintiff agrees [sic] Defendants' statement of facts in paragraphs 14 through 17 of their Motion for Summary Judgment dealing with Mrs. Betts['] transactions with Advance America are not inaccurate but to fully explain Mrs. Betts' dealings with Advance America Plaintiff sets forth these additional facts...." Docket No. 90.

The Court heard Advance America's summary judgment motion and Betts' class certification motion on November 21, 2000. Docket No. 96. The Court stated that it would recommend that the district court grant the motion for summary judgment and deny the class certification motion. The Court invited both parties to file proposed finding of fact and conclusions of law for inclusion in this order. On December 20, 2000, Betts filed a document captioned "Plaintiff's Response to Defendants' Proposed Findings of Fact and Conclusions of Law" that repeated verbatim the "additional facts" listed in Betts' motion for summary judgment. Docket No. 100.[3]

## II. STANDARD OF REVIEW

### A. Summary Judgment

#### 1. Burden of Movant and Non–Movant on Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interroga-

---

**3.** Defendants provided a courtesy copy of its proposed findings of facts and conclusions of law to chambers, but failed to file a signed original copy with the Clerk.

tories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593–94 (11th Cir.1995); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). A moving party discharges its burden on a motion for summary judgment by showing the Court that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *Id.* When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989); *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The Eleventh Circuit has explained the reasonableness standard:

> in deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.

When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*Jeffery v. Sarasota White Sox*, 64 F.3d 590, 594 (11th Cir.1995), quoting *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron and Steel Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir.1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. On a summary judgment motion the Court may not weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir.1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be presented to the trier of fact. *Id.*

### 2. Material Submitted in Opposition to Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that the party making a motion for summary judgment may submit affidavits to support its argument as to the absence of a genuine issue of material fact. Rule 56(e) provides as follows regarding the materials that the non-movant must submit in response:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented

or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The non-movant must adduce significant probative evidence that would be sufficient for a jury to find for the non-movant. *LaChance v. Duffy's Draft House*, 146 F.3d 832, 834 (11th Cir.1998), *citing Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505.

■ A reviewing court generally cannot consider inadmissible hearsay evidence in opposition to a summary judgment motion. *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir.1999). In considering a motion for summary judgment, a reviewing court must consider all the proffered evidence and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition. *Kennett–Murray Corporation v. Bone*, 622 F.2d 887, 893 (5th Cir.1980). However, when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony. *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir.1984).

## B. Class Certification

■ Federal Rule of Civil Procedure 23(a) states as follows:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b) further provides that:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

A class action may be maintained only when it satisfies all the requirements of Fed. R.Civ.P. 23(a) and at least one of the alterna-

tive requirements of Rule 23(b). *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000). In weighing class certification, a reviewing court must consider as a principal factor the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class. *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir.1987). The initial burden of proof to establish the propriety of class certification rests with the advocate of the class. *Rutstein,* 211 F.3d at 1233.

## III.  *FINDINGS OF FACT*

Despite the Court's clear instructions, Betts failed to rebut the facts identified by Advance America as uncontested in its July 19, 2000 summary judgment motion. Betts has also failed to adduce even a single piece of record evidence to resist summary judgment. Therefore, the Court takes Advance America's undisputed facts as true. The Court makes additional findings based upon Betts' own statements made during her August 17, 1999 deposition. Docket No. 54.

### A.  "Undisputed" Facts Deemed Admitted [4]

Advance America, Cash Advance Centers of Florida, Inc. ["Advance America"] is engaged in the business of cashing checks. It is licensed by the Florida Department of Banking and Finance (the "Department") and is regulated pursuant to Florida Statutes Chapter 560, Part III, and the regulations promulgated thereunder. Advance America, Cash Advance Centers, Inc., is the parent corporation of Advance America. Defendants Steve A. McKenzie and George D. Johnson, Jr. are board members of the parent company.

When Advance America entered the Florida market, it undertook a concerted effort to ensure that it complied with Florida law and the regulations governing the operation of its business. William M. "Billy" Webster IV, Chief Executive Officer of Advance America, personally met with officials in the Depart-

ment charged with regulation of check cashers. In the course of applying for its license as a check casher and in a face-to-face meeting with William Douglas Johnson, Assistant Director of the Department, Advance America fully detailed the manner in which it planned to conduct its business in Florida. When the Department identified practices or procedures that it believed were not authorized, it notified Advance America. Advance America complied with all the directions of the Department.

By letter dated December 22, 1997, Advance America explicitly stated that "[a]ll the checks to be cashed will be postdated as of the date of the customer's next payday (up to a maximum of 14 days following the date of the transaction)." The Department did not find anything about such a transaction which placed it outside the regulatory scheme. The Department issued license number 498–380/CC to Advance America on March 8, 1998. Advance America began doing business in the state immediately.

On May 5, 1998, the Department, through Doug Johnson, sent a letter of direction to check cashers in Florida, including Advance America. Among these directives was the requirement that check cashers give currency (and currency only) to customers in exchange for their checks and that they limit verification fees to the lesser of the actual costs of verification or five dollars. The letter further advised that any " 'rollover,' 'extension,' or 'renewal' of a deferred deposit check for an additional fee may constitute interest." In reliance upon its discussions with and the directives from the Department, Advance America operates as follows. Advance America accepts and cashes personal checks, which may be postdated by up to fourteen days. Advance America provides its check-cashing customers with a written contract specifying: i.) the date on which the check will be presented for deposit if not redeemed before that for cash; ii.) the fees charged for cashing the check and for verification of the customer's financial information; iii.) that the customer must present cash in

---

**4.** The following facts are drawn verbatim (with only non-substantive editorial changes) from Advance America's July 19, 2000 summary judgment motion at Docket No. 73 at 1–8. Individual, paragraph-by-paragraph citations are omitted.

order to redeem the check; iv.) Truth-in-Lending disclosures of finance charges, annual percentage rate, and amount financed, in the prescribed format, together with a statement that the information is provided to comply with a possible application of federal law and not in recognition that the fees charged are "interest."

On May 21, 1998, Monica Allie of Advance America met with Doug Johnson of the Department to again discuss and evaluate Advance America's Florida operations. Shortly after that meeting, Ms. Allie sent Mr. Johnson a brochure which explained Advance America's business. The Department has not asserted, formally or informally, that Advance America is not in full compliance with the laws and regulations of the State of Florida.

## B. Factual Findings Based on Betts' Own Statements [5]

Wendy Betts has some formal training in principles of account and banking. Page 6, lines 17–21. Her past job experience includes working as a teller for two different banks (Mellon Bank in Pittsburgh, Pennsylvania and Sun Bank in Florida) and in the payroll department of Westinghouse Corporation. Page 9–13. Betts first began doing business with check-cashing companies in 1996. Page 21, line 9. Betts began doing business with Advance America in April 1998. Page 19, line 14. Betts terminated her relationship with Advance America in March 1999. Page 44, line 9. During the time that she was conducting business with Advance America, Betts was also conducting business with four other check-cashing companies. Page 44, lines 15–18.

On April 6, 1998, Betts filled out an Advance America application form required to commence doing business with Advance America. Page 64, lines 21–25. One question on this form inquired as to the applicant's prior experience with check-cashing companies. Page 65, lines 8–11. Betts left this portion of the application blank, fearing that her prior experience with other check-cashing companies would disqualify her from using Advance America's services. Page 65,

lines 12–15. After submitting the application for processing, Betts tendered a check in the amount of $335 and received $300 in cash. Page 51, line 18; page 56, lines 4–6. On April 16, 1998, Betts returned to Advance America and bought back her $335 check. Page 57, lines 3–5. Betts understood fully the April 6 transaction, including the fact that she was paying a $35 fee. Page 56, lines 1–3, 18–20. Advance America charged no fees other than those it disclosed in writing to Betts. Page 54, lines 16–19. Advance America did not make any misrepresentations to Betts. Page 57, lines 15–18.

After repurchasing her $335 check on April 16, 1998, Betts immediately repeated the April 6 transaction by tendering another check in exchange for $300 cash. Page 52, lines 4–22. Betts thereafter continued to engage in identical transactions on a bi-weekly basis. Page 144, lines 20–23. After July 31, 1998, Betts increased the amount of these transactions to $400. Page 145, lines 3–7.

Each time Betts engaged in a transaction with Advance America, she was given a form check-cashing agreement that contained an annual percentage rate disclosure. Page 131, line 6 to page 132, line 22. At no time during her dealings with Advance America did Advance America make any misrepresentations to Betts. Page 57, lines 19–22. Betts engaged in each transaction of her own free will. Page 133, lines 3–6. Except for one instance, Betts always tendered the full amount in cash necessary to buy back her previous check before engaging in a subsequent cashing transaction with respect to a new check. Page 82, line 19 to page 83, line 11.

In early November 1998, Betts was unable to come up with sufficient cash to buy back one of her checks. Page 69, lines 1–6. She therefore put a stop-payment order on that check rather than allow Advance America to deposit it. Page 102, lines 16–21. In response, an Advance America representative repeatedly contacted Betts, as well as the individuals previously named by Betts as references, in order to make payment arrangements. Page 69, line 10 to page 70, line 1.

**5.** All citations are to Betts' August 17, 1999 deposition at Docket No. 54.

Though persistent, the Advance America representative was always very nice and polite and never threatened Betts in any way. Page 71, lines 3–11. Advance America never threatened legal action against Betts. Page 74, line 25 to page 75, line 9. After further discussions involving a second Advance America representative, Betts paid off the amount she owed. Page 72, lines 16–18. She then continued to do business with Advance America. Page 72, lines 19–21.

Betts began to reconsider her use of check-cashing companies in January 1999 after reading a newspaper article. Page 59, lines 1–15. In response to this article, as well as the less scrupulous collection tactics of another check-cashing company she had dealt with, Betts wrote a letter to the Department. Page 85, lines 1–12; page 86, lines 4–17. The Department responded with a letter suggesting that Betts might want to speak with attorney Clayton Yates (one of Betts' several counsel of record in the present action). Page 87, line 3 to page 88, line 3.

Betts terminated her relationship with Advance America after consulting Yates. Page 107, lines 4–7. On the advice of counsel, she refused to pay the $443 balance she then owed to Advance America. Page 107, lines 19–21; page 108, line 23 to page 109, line 1. Betts has sued three other check-cashing companies in addition to Advance America. Page 115, lines 9–10. The decision to sue each of them was made by her lawyers. Page 116, line 22 to page 117, line 6. She did not have any input whatsoever in this decision. Page 117, lines 7–9. Prior to contacting Yates, Betts had no thought of suing Advance America. Page 123, lines 1–4.

Betts never saw the June 21, 1999 amended complaint prior to her deposition on August 17, 1999. Page 135, line 18 to page 136, line 1. Her lawyers read it to her during a car trip on a date she could not remember. Page 136, lines 11–22. Betts has no clear understanding of her duties or obligations as a putative class representative in the present litigation. Page 124, line 3 to page 125, line 4. She cannot identify any qualities that allow her to fairly and adequately represent fellow class members other than her "experience." Page 128, lines 11–17.

## IV. CONCLUSIONS OF LAW

### A. Motion for Summary Judgment

#### 1. Count 1

Florida law imposes certain civil and criminal penalties on usurious transactions. Fla. Stat. Chapter 687. Fla. Stat. § 687.02(1) states that:

> All contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious. However, if such loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligation exceeds $500,000 in amount or value, then no contract to pay interest thereon is usurious unless the rate of interest exceeds the rate prescribed in s. 687.071.

Fla. Stat. § 687.147(1) provides that:

> Any borrower injured by a violation of this act may bring an action for recovery of damages. Judgment shall be entered for actual damages, but in no case less than the amount paid by the borrower to the loan broker, plus reasonable attorney's fees and costs. An award may also be entered for punitive damages.

Fla. Stat. § 687.031 states that:

> Sections 687.02 and 687.03 shall not be construed to repeal, modify or limit any or either of the special provisions of existing statutory law creating exceptions to the general law governing interest and usury and specifying the interest rates and charges which may be made pursuant to such exceptions, including but not limited to those exceptions which relate to banks, Morris Plan banks, discount consumer financing, small loan companies and domestic building and loan associations.

Florida law also regulates the operation of money transmitters, including check cashers. Fla. Stat. Chapter 560 [the "Money Trans-

mitters' Code"]. Fla. Stat. § 560.309(4) provides that:

> Exclusive of the direct costs of verification which shall be established by department rule, no check casher shall:
>
> (a) Charge fees, except as otherwise provided by this part, in excess of 5 percent of the face amount of the payment instrument, or 6 percent without the provision of identification, or $5, whichever is greater;
>
> (b) Charge fees in excess of 3 percent of the face amount of the payment instrument, or 4 percent without the provision of identification, or $5, whichever is greater, if such payment instrument is the payment of any kind of state public assistance or federal social security benefit payable to the bearer of such payment instrument; or
>
> (c) Charge fees for personal checks or money orders in excess of 10 percent of the face amount of those payment instruments, or $5, whichever is greater.
>
> (d) As used in this subsection, "identification" means, and is limited to, an unexpired and otherwise valid driver license, a state identification card issued by any state of the United States or its territories or the District of Columbia, and showing a photograph and signature, a United States Government Resident Alien Identification Card, a United States Passport, or a United States Military identification card.

Fla. Stat. § 560.107 states that:

> No person acting, or who has acted, in good faith reliance upon a rule, order, or declaratory statement issued by the department shall be subject to any criminal, civil, or administrative liability for such action, notwithstanding a subsequent decision by a court of competent jurisdiction invalidating the rule, order, or declaratory statement. In the case of an order or a declaratory statement that is not of general application, no person other than the person to whom the order or declaratory statement was issued is entitled to rely upon it, except upon material facts or circumstances that are substantially the same

as those upon which the order or declaratory statement was based.

Advance America is a duly qualified and licensed "check casher" within the meaning of Fla. Stat. § 560.309(4). The term "payment instrument" is defined as "a check, draft, warrant, money order, travelers check or other instrument or payment of money, whether or not negotiable. Payment instrument does not include an instrument that is redeemable by the issuer in merchandise or service, a credit card voucher, or a letter of credit." Fla. Stat. § 560.103(14). The term "cashing" is defined as "providing currency for payment instruments, except for travelers checks and foreign-drawn payment instruments." Fla. Stat. § 560.302(1). The Money Transmitter's Code does not define the term "check." However, the Department has promulgated Rule 3C–560.803 of the Florida Administrative Code, which states that "[a] check casher may accept a postdated check, subject to the fees established in Section 560.309(4), F.S." The Money Transmitter's Code empowers the Department to "issue orders and declaratory statements, disseminate information, and otherwise exercise its discretion to effectuate the purposes, policies, and provisions of the code and to adopt rules pursuant to ss. 120.536(1) and 120.54 to implement the provisions of the code." Fla. Stat. § 560.105(3). The term "check" as used in the Money Transmitter's Code includes post-dated checks.

██ The Money Transmitter's Code does explicitly state whether and, if so how, the Money Transmitter's Code is to be read in conjunction with (either as limited by or as limiting) the usury prohibitions of Chapter 687. The Attorney General of the State of Florida has issued a recent opinion addressing the overlap between the Money Transmitter's Code and the usury prohibitions of Chapter 687 with regard to so-called "payday loans," in which he states:

> I am of the opinion that a "payday loan" or like transaction whereby a company provides cash to the consumer who, in return, provides a personal check that is held by the company for a certain time period and covers the amount of cash provided as well as a fee charged for advancing the cash,

constitutes a loan subject to the usury laws. A company registered under Chapter 560, Florida Statutes, however, may cash personal checks for the fees prescribed in that chapter without violating the usury laws if such transactions are concluded without being extended, renewed, or in any way continued with the imposition of additional fees.

Attorney General Opinion 2000–26 (May 1, 2000). While the opinions of a state's attorney general may be helpful and even persuasive to a court, they are advisory only and do not carry the force of a judicial decision. *Romero v. Coldwell,* 455 F.2d 1163, 1165 (5th Cir.1972). The Court finds the reasoning of AG 2000–26 persuasive, and concludes that the Money Transmitter's Code provides a limited safe-harbor exception from the usury prohibitions of Chapter 687 for transactions that, although "loans" within the meaning of Chapter 687, comply fully with the requirements of the Money Transmitter's Code and are "concluded without being extended, renewed, or in any way continued with the imposition of additional fees." Each of Betts' transactions with Advance America was a "payday loan" within the meaning of AG 2000–26 and a "loan" within the meaning of Chapter 687.

Betts raises no genuine issue of material fact to rebut Advance America's contention that it at all times fully complied with the prerequisites necessary to invoke the safe harbor created by the Money Transmitter's Code. Although Betts engaged in numerous transactions with Advance America, Advance America never extended, renewed, or any way continued any of these transactions. Instead, Advance America required Betts to tender the full amount in cash that she owed before engaging in further transactions. After completing each transaction, Betts was free to terminate the relationship with Advance America, but opted instead to engage in numerous consecutive transactions with Advance America for her own convenience. On the one occasion when Betts failed to tender the amount she owed, Advance America commenced persistent, but polite collection activities. Advance America never threatened Betts in any way and never threatened legal action. Betts made payment arrangements with Advance America and continued to do business with it.

### 2. Count 2

The second amended complaint alleges that defendants violated the Florida Consumer Finance Act [Fla. Stat. Ch. 516], which regulates the conduct of persons making consumer finance loans. The term "consumer finance loan" is defined as "a loan of money, credit, goods, or choses in action, including, except as otherwise specifically indicated, provision of a line of credit, in an amount or to a value of $25,000 or less for which the lender charges, contracts for, collects, or receives interest at a rate greater than 18 percent per annum." Fla. Stat. § 516.01(2).

The Florida Consumer Finance Act does explicitly state whether and, if so how, it is to be read in conjunction with (either as limited by or as limiting) the Money Transmitter's Code. Although not specifically addressing the interplay between the Florida Consumer Finance Act and the Money Transmitter's Code, AG 2000–26 is instructive. The Court finds that the Money Transmitter's Code provides a limited safe-harbor exception from the Florida Consumer Finance Act for transactions that, although "consumer finance loans" within the meaning of the Florida Consumer Finance Act, comply fully with the requirements of the Money Transmitter's Code and are concluded without being extended, renewed, or in any way continued with the imposition of additional fees. Each of Betts' transactions with Advance America was a "consumer finance loan" within the meaning of the Florida Consumer Finance Act. For the reasons discussed above, Betts raises no genuine issue of material fact to rebut Advance America's contention that it at all times fully complied with the prerequisites necessary to invoke the safe harbor created by the Money Transmitter's Code.

### 3. Count 3

The second amended complaint alleges that defendants violated the Florida Deceptive and Unfair Trade Practices Act ["DUTPA," Fla. Stat. Ch. 501, Part II]. DUTPA provides in relevant part that:

(1) Unfair methods, of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(2) It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1).

Fla. Stat. § 501.204. No exact definition of the term "unfair or deceptive acts or practices" is provided in DUTPA. *Urling v. Helms Exterminators, Inc.,* 468 So.2d 451, 453 (Fla. 1st DCA 1985). A finding of fraud is not necessary to sustain a violation of DUTPA. *Urling,* 468 So.2d at 453. One court has suggested that a practice that offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers may violated DUTPA. *Urling,* 468 So.2d at 453, *citing Spiegel, Inc. v. Federal Trade Comm.,* 540 F.2d 287, 293 (7th Cir.1976).

Betts fails to adduce a single piece of record evidence to support her contention that Advance America violated DUTPA. By her own admission, Advance America never made any misrepresentations to her. Advance America did not employ any immoral, unethical, oppressive, unscrupulous business tactics in its dealings Betts, even when Betts unilaterally stopped payment on one of her checks.

### 4. Count 4

▌ The second amended complaint alleges that defendants "engaged in a fraudulent scheme, artifice and device by which they extracted usurious sums and exorbitant charges from Plaintiff and others similarly situated." To make out a cause of action for fraud under Florida law, a plaintiff must establish that the defendant made a deliberate and knowing misrepresentation designed to cause, and actually causing detrimental reliance by the plaintiff. *First Interstate Development Corp. v. Ablanedo,* 511 So.2d 536, 539 (Fla.1987). Betts fails to adduce a single piece of record evidence to support her contention that Advance America defrauded her. By her own admission, Advance America never made any misrepresentations to her.

### 5. Count 5

▌ The second amended complaint alleges that defendants collected an unlawful debt in violation of the Florida Civil Remedies for Criminal Practices Act [Fla. Stat. Ch. 772], which provides that:

It is unlawful for any person:

(1) Who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

(2) Through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

(3) Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.

(4) To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3).

Fla. Stat. § 772.103. As described above, the transactions that Betts engaged in with Advance America were not unlawful and thus cannot serve as predicate acts under Chapter 772.

### 6. Count 6

▌ The second amended complaint alleges that defendants collected an unlawful debt in violation of the Racketeer Influenced and Corrupt Organizations Act ["RICO," 18 U.S.C. § 1961 *et seq.*], which provides that:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeer-

ing activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

\*　　\*　　\*　　\*　　\*　　\*

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962. As described above, the transactions that Betts engaged in with Advance America were not unlawful and thus cannot serve as predicate acts under RICO.

### B. Motion for Class Certification

■ The Court's proposed ruling on Advance America's motion for summary judgment [Docket No. 73] would render moot Betts's motion for class certification. Docket No. 62. However, the Court makes the following additional findings regarding the proposed class certification. Betts seeks to define the aggrieved class as "anyone who's consummated a loan transaction with the defendants." Docket No. 97 at page 51, lines 6–7. Betts offers no evidence of the size of this class other than one deponent's speculation that it exceeds (by an unspecified amount) 10,000. Docket No. 62 at 9.

Betts own statements demonstrate that her claims and defenses are not typical of those of her proposed class. Before she ever encountered Advance America, Betts already had experience with both the field of finance in general and the check-cashing industry. She maintains that she understood fully the economics of her transactions with Advance America and denies that it made any misrepresentations to her.

Betts own statements demonstrate that she will not adequately represent the proposed class. She admits that the decision to sue Advance America (as well as three other check-cashing companies) was made by her lawyers without any input from her. Prior to contacting her current attorney, Betts had no thought of suing Advance America. Also, Betts has no clear understanding of her duties or obligations as a putative class representative in the present litigation. She cannot identify any qualities that allow her to fairly and adequately represent fellow class members other than her "experience." Finally, Betts' willingness to conceal her prior history of dealings with check-cashers in order to do business with Advance America suggests that she may be less than forthright as a class representative.

Betts' actions in the conduct of this case (including the failure to comply with Court's August 29, 2000 order requiring a statement of disputed facts and the failure to file any record evidence in opposition to summary judgment) suggest that she may be less than vigorous in asserting and defending the interests of the members of the proposed class. Accordingly, it is

**RECOMMENDED** that the defendants' motion for summary judgment [Docket No. 73] filed July 17, 2000 be **GRANTED**. It is

**FURTHER RECOMMENDED** that the plaintiff's amended motion for class certification [Docket No. 62] filed April 25, 2000 be **DENIED**.

Failure to file and serve written objections to the proposed findings and recommendations in this report, pursuant to 28 U.S.C. § 636(b)(1)(B) and (e) and Local Rule 6.02, within ten days of the date of its filing shall bar an aggrieved party from a de novo de-

termination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Orlando, Florida this 31st day of January, 2001.