879 So.2d 667 (2004)
Wendy BETTS, on behalf of herself and all others similarly situated, Appellant,
v.
McKENZIE CHECK ADVANCE OF FLORIDA, LLC, d/b/a National Cash Advance, Steve A. McKenzie, and Brenda G. McKenzie, and unknown entities and individuals, Appellees.
No. 4D03-3268.
District Court of Appeal of Florida, Fourth District.
August 11, 2004.
*668 Christopher C. Casper of James, Hoyer, Newcomer & Smiljanich, P.A., Tampa, E. Clayton Yates of Law Office of E. Clayton Yates, P.A., Fort Pierce, and Richard A. Fisher of Richard Fisher Law Office, Cleveland, TN, for appellant.
Virginia B. Townes of Akerman Senterfitt, Orlando, for appellee McKenzie Check Advance of Florida, LLC, d/b/a National Cash Advance.
Claudia Callaway of Paul, Hastings, Janofsky & Walker, LLC, Washington, D.C., for appellees Steve A. McKenzie and Brenda G. McKenzie.
HAZOURI, J.
This case is one in a growing number of cases addressing the "Money Transmitters' Code" (the Code), Chapter 560, Florida Statutes, and its effect on the check cashing industry. The primary issue presented is whether the Code, as it existed in 1997, either authorized or prohibited the transactions which occurred between appellant, Wendy Betts (Betts), and appellee, National Cash Advance (NCA). A secondary issue is the interplay between Florida's usury laws and the Code and what, if any, is the effect of these statutes on modern check cashing practices.
Procedurally, we are asked to review the trial court's grant of summary judgment in favor of NCA in Betts's class action lawsuit asserting claims for violation of Florida's usury laws and other laws established to insure consumer protection. We disagree with the authority upon which the trial court's decision was based,[1] reverse the summary judgment, and remand for further proceedings.

I. Factual Background
Betts's business relationship with NCA began in August 1997 when she gave NCA two checks, each in the amount of $115. In return, she received $200 in cash and NCA's promise to defer presentment of the checks for a specified time. Approximately *669 one week later, Betts redeemed the checks for cash. Less than one week later, Betts gave NCA three more checks, each for $115, in exchange for $300 and the same promise by NCA. Approximately two weeks later, Betts replaced the checks with three new checks, which she ultimately replaced with cash two weeks thereafter. A number of similar transactions subsequently took place, with Betts continuing to replace one check with another check, each time paying a fee,[2] until December 1997 when she redeemed all checks with cash.
In check-cashing jargon, the transactions between Betts and NCA are characterized as "deferred presentment" and "rollover" transactions. In a deferred presentment transaction, the lender accepts a check in the amount of the loan plus a fee. The lender cashes the check, retains the fee, and gives the customer the remainder. In addition, the lender agrees not to deposit the check for an agreed-upon time. If, prior to the expiration of the loan term, the customer elects to redeem the check with cash, he or she may do so, with no further obligation to the lender. See Lynn Drysdale & Kathleen E. Krest, The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and Its Challenge to Current Thinking About the Role of Usury Laws in Today's Society, 51 S.C.L.Rev. 589, 600 (2000).
If, on the other hand, the customer is unable to redeem the check with cash, he or she may elect a rollover transaction or extension of the term. In this scenario, the customer replaces one check with another check prior to the expiration of the loan term and pays an additional fee (usually ten percent of the face amount of the check plus a five dollar verification fee). The acceptance by the lender of the substituted check, results in an extension of the loan term. In many cases, a customer will "roll over" the loan term many times before either redeeming the check for cash or defaulting and suffering additional penalties for insufficient funds when the lender presents the check to the bank and it is returned unpaid.
Such practices are apparently the norm in the check-cashing industry and have become a topic of much debate. Some view the relationship between check casher and consumer as the provision of a valuable financial service, i.e., a short-term loan or cash advance, to one who might not otherwise have access to such services. See id. Others take the position that the check casher is a predatory lender of money at usurious rates who takes advantage of low-income and financially strapped consumers, which leads to their financial ruin. See id. at 592-99.
Opponents of these practices argue that these transactions are not check cashing, but rather, are short-term loan agreements and the fees are, essentially, interest. See id. at 619-20. With the average loan term under these situations being two weeks,[3] and the average fee with each renewal or rollover being ten percent of the loan amount plus five dollars, opponents argue that the annual percentage rate is grossly in excess of the interest cap *670 established by the usury laws.[4]Id. Lenders rebuke the characterization that this is a "debt treadmill" arguing, instead, that "such lending [i]s a bridge enabling passage through temporary [financial] setbacks." Id. at 605; see also Scott Andrew Schaaf, From Checks to Cash: The Regulation of the Payday Lending Industry, 5 N.C. Banking Inst. 339, 346 (2001).

II. Statutory Overview
Traditionally, transactions involving the lending of money for a fee or at a particular rate of interest fall under the purview of the usury laws. See generally § 687.02(1), Fla. Stat. (1997) (defining "usurious contracts" as "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, . . . at a higher rate of interest than the equivalent of 18 percent per annum simple interest"). Arguably, the transactions described above could be characterized as usurious. They are contracts for the advance of money which result in an effective rate of interest (cost to use the lender's money) well above the interest cap. Florida, however, is now one of twenty-three states which permits these transactions subject to strict regulation. See Schaaf, supra, at 358; see also Chapter 560, Fla. Stat. (2001).
With the passage of the Code in 1994, the Legislature sought to regulate the practices of the money transmitter industry. See § 560.102, Fla. Stat. (Supp.1994). From the Code's inception, regulation of the check-cashing industry was contemplated within this scheme. See § 560.103(10), Fla. Stat. (Supp.1994) ("`Money transmitter' means any person located in or doing business in this state who acts as a payment instrument seller, foreign currency exchanger, check casher, or funds transmitter"); see also § 560.301 (titled, "Check Cashing and Foreign Currency Exchange Act"). The Code establishes registration and record-keeping requirements as well as imposes a cap on the fees a check casher may charge. See §§ 560.303, 560.309, 560.310, Fla. Stat. (Supp.1994).
The 1994 version of the Code did not specifically address or authorize deferred presentment or rollover transactions. In 2001, however, the Legislature amended the Code, adding a fourth part, specifically addressing deferred presentment. See § 560.401 ("Deferred Presentment Act"), Fla. Stat. (2001). A "deferred presentment transaction" is defined as "providing currency or a payment instrument in exchange for a person's check and agreeing to hold that person's check for a period of time prior to presentment, deposit, or redemption." § 560.402(6), Fla. Stat. (2001). In the amended version of the statute, the Legislature expressly authorized deferred presentment transactions subject to the lender's compliance with strict record-keeping, notice, and Truth-in-Lending disclosure requirements. See § 560.404, et. seq., Fla. Stat. (2001). The statute limits the face amount of the check taken for deferred presentment to not more than $500 and caps the fee at ten percent. See §§ 560.404(5) & (6), Fla. Stat. (2001). The statute expressly prohibits the post-dating of checks and any rollover or extension of a deferred presentment agreement. See §§ 560.404(12), (14) & (18), Fla. Stat. (2001).

III. Interpretation of the Code:

A. Department of Banking and Finance Regulations
In both versions of the Code, the Legislature granted the Department of Banking *671 and Finance (the Department) "general regulatory powers" limited, by express statutory language, to "[o]nly such rule-making power and administrative discretion. . . as is necessary, in order that the supervision and regulation of money transmitters may be flexible and readily responsive to changes in economic conditions." § 560.102(1), (2)(h), Fla. Stat. (Supp.1994) and Fla. Stat. (2001). To that end, the Department has supervisory, investigatory, enforcement, and disciplinary powers. See §§ 560.105, 560.108; 560.109, 560.112, 560.113, 560.114, Fla. Stat. (Supp.1994) and Fla. Stat. (2001). Among the Department's supervisory powers is the "[p]ower to issue and publish rules, orders, and declaratory statements, disseminate information, and otherwise exercise its discretion to effectuate the purposes, policies, and provisions of the code and to interpret and implement the provisions of the code." § 560.105(3), Fla. Stat. (Supp.1994).
In September 1997, the Department issued rules interpreting the Code. By these rules, the Department expressly approved deferred presentment transactions subject to certain restrictions, which were also imposed by the rules. See Fla. Admin. Code, Part VIII, Ch. 3C-560, (1997). The rules permitted a check casher to accept a post-dated check, and capped the transaction fees at ten percent and the verification fees at five dollars. See Fla. Admin. Code R. 3C-560.801, 560.803, 560.905 (1997).

B. Betts v. Ace Cash Express, Inc.
Prior to the transactions involved in this case, the only other court in Florida to address these issues was the Fifth District Court of Appeal in Betts v. Ace Cash Express, Inc., 827 So.2d 294 (Fla. 5th DCA 2002). That case was also a class action suit brought by Betts against another check casher with whom she had transacted business; the facts are very similar to those in this case. There, as here, Betts alleged that Ace Cash's check-cashing activities, particularly, the company's deferred presentment practices, violated the state's usury laws. See id. at 295-96. As in this case, the date of the transactions preceded the 2001 amendment to the statute.
The Fifth District rejected Betts's argument that the transactions constituted loans which violated Florida's usury statute holding, instead, that the transactions were authorized by Chapter 560, Florida Statutes (2000), and that the charges were fees authorized by the statute. See id. In so doing, the court placed substantial weight and emphasis on the rules promulgated by the Department interpreting the Code, as well as an advisory opinion issued by the Department in February 1995, which was solicited by the Florida Check Cashiers Association. See id. at 296-97. In the letter, the Department authorized "deferred deposit" transactions provided they were "offered and managed pursuant to the provisions of Chapter 560, Florida Statutes, and specifically within the fee caps contained within section 560.309(4), Florida Statutes." See id. at 297. The Ace Cash court affirmed the dismissal of Betts's complaint, holding as follows:
After considering the Department's advisory opinion solicited by the FCAA in advance of any deferred presentment transactions between the Plaintiffs and the Defendants, the subsequent authorization of the practice by the Florida Legislature, and the absence of any prohibition against the practice in the interim we disagree with the Plaintiffs' characterization of the initial transaction as a loan. See State v. Cotton, 769 So.2d 345, 349 (Fla.2000) (later statutory amendment is clarification of legislative intent).
Id.
Although the Ace Cash court was apparently not called upon to consider the legality *672 of rollover transactions, it nevertheless engaged in that analysis. See id. at 297-300. The court noted that the 2001 version of the Code, the same version the court relied upon to retroactively approve deferred presentment transactions, expressly prohibited rollover transactions. See id. at 297. Despite that prohibition, the Ace Cash court concluded that rollover transactions were voluntary transactions entered into by customers with choices and lenders who were willing to accommodate. See id. at 298-99. The court concluded that Chapter 560 was the Legislature's attempt to "find workable restrictions for an originally broad statute without drying up the well for those who are in need of financial assistance even though it may be an expensive source." Id. at 299; accord Fastfunding The Company, Inc. v. Betts, 852 So.2d 353 (Fla. 5th DCA 2003) (rejecting Betts's usury law violation arguments based upon the rationale in Ace Cash).

IV. Legal Analysis and Application to the Present Case
The trial court in this case relied upon Ace Cash in granting summary judgment in favor of NCA.[5] For the reasons discussed below, we disagree with the Fifth District's decision in Ace Cash, reverse the final judgment in this case, and remand for further proceedings.
For purposes of the analysis, the characterization of the transactions is important. There is no question that what takes place is something more than simple check cashing. In a deferred presentment transaction, the customer is advanced money in exchange for a check which the lender agrees not to immediately cash. In exchange for agreeing to defer presentment of the check, the lender exacts a fee. As Betts argues in this case, one might wonder why anyone would utilize the services of a "check casher" and pay for what he or she could otherwise obtain for free at a bank. Clearly, it is because the customer does not have the funds readily available to honor the check. Thus, there can be no question that what takes place is essentially an advance of money or a short-term loan. See Party Yards, Inc. v. Templeton, 751 So.2d 121, 122 (Fla. 5th DCA 2000) ("In usury cases, courts look to substance over form because the purpose of usury statute is to protect the needy borrower by penalizing the unconscionable lender.").
In 1997, when the transactions between Betts and NCA took place, the Code did not specifically address or authorize deferred presentment or rollover transactions. Chapter 687, Florida Statutes (1997)(the Usury Statute) did, however, govern lending practices, and particularly, "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt." § 687.02(1), Fla. Stat. (1997). According to the Usury Statute, such contracts were considered usurious if they resulted in a rate of interest higher than "18 percent per annum simple interest." Id. There is no dispute that the cost *673 Betts paid to use the money for a specified time,[6] i.e., the term of the deferred presentment period, far exceeded the simple interest rate of 18 percent annually and violated the Usury Statute.
When asked to consider whether these transactions were usurious, however, the Department did not rely upon the Usury Statute in the absence of express authorizing language in the Code. Rather, the Department issued rules creating exceptions to the Code and expanded the impact of the Code. We recognize that the Legislature empowered the Department with the authority to interpret the Code, issue rules and regulations, and oversee the Code's implementation. Moreover, we realize that the Department's interpretation is entitled to great weight. See Gay v. Can. Dry Bottling Co. of Fla., 59 So.2d 788, 790 (Fla.1952) (noting that, "the contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized"). The Department's authority in this regard, however, is not unbridled.
Section 120.52(8), Florida Statutes (1997), states:
(8) "Invalid exercise of delegated legislative authority" means action which goes beyond the powers, functions, and duties delegated by the Legislature. A proposed or existing rule is an invalid exercise of delegated legislative authority if any one of the following applies:
. . . .
(b) The agency has exceeded its grant of rulemaking authority, citation to which is required by s. 120.54(3)(a)1;
(c) The rule enlarges, modifies, or contravenes the specific provisions of law implemented, citation to which is required by s. 120.54(3)(a)1;
. . . .
A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement, interpret, or make specific the particular powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than the particular powers and duties conferred by the same statute.
Among the original stated purposes of the Code is the desire to promote "[t]he safe and sound conduct of the business of money transmitters" and to protect "the interests of the public in the money transmitter system." § 560.102, Fla. Stat. (Supp.1994). To that end, the Legislature gave the Department "[o]nly such rulemaking power and administrative discretion. . . as is necessary, in order that the supervision and regulation of money transmitters may be flexible and readily responsive to changes in economic conditions, in technology, and in money transmitter practices." § 560.102(h), Fla. Stat. (Supp. 1994). In the pre-2001 version of the Code, the Legislature clearly defined the *674 activities in which check cashers and money transmitters are allowed to engage. See § 560.103(3), (10), Fla. Stat. (1994). As discussed above, deferred presentment transactions were not contemplated in the framework of selling and exchanging payment instruments. Further support of this conclusion is the fact that, in amending the Code in 2001, the Legislature added a separate and distinct part to the Code, Part IV, specifically addressing deferred presentment transactions.
Thus, we conclude that deferred presentment transactions were never intended by the Legislature to be an activity authorized by the pre-2001 Code. Therefore, the Legislature did not delegate to the Department the authority to either approve or regulate these types of transactions. Consequently, in issuing rules approving deferred presentment transactions, the Department exceeded its authority.
We turn now to the conclusion drawn by the majority in Ace Cash, that the Legislature's subsequent amendment to the Code to encompass deferred presentment transactions is a statement of its prior intent. Ace Cash, 827 So.2d at 297. We reject this conclusion. Although it is sometimes appropriate to consider a subsequent amendment to clarify original legislative intent "if such amendment was enacted soon after a controversy regarding the statute's interpretation arose," see Lowry v. Parole & Prob. Comm'n, 473 So.2d 1248, 1250 (Fla.1985); it is inappropriate to use an amendment for this purpose when it was enacted ten years after the original enactment. See Parole Comm'n v. Cooper, 701 So.2d 543 (Fla. 1997). In this case, the original enactment of the Code was in 1994. The amendment which authorized deferred presentment transactions and prohibited rollover transactions occurred in 2001.
Additionally, as previously noted, the 2001 amendment was not merely a modification of the prior act done for the purpose of clarifying that deferred presentments were, in fact, contemplated in the original version. Rather, it resulted in the addition of an entirely new and separate part of the Code addressing only deferred presentments and rollovers. See § 560.401, et. seq., Fla. Stat. (2001)("Deferred Presentment Act"). With the passage of the 2001 amendment, the Legislature went well beyond simply approving the transactions and imposing a fee cap. In addition, it established strict and detailed guidelines for those who wish to engage in deferred presentment transactions. Moreover, the amended Code expressly prohibits rollovers in any form. See § 560.404(18), Fla. Stat. (2001). Clearly, by amending the Code, the Legislature sought to add greater consumer protections, which were not previously in place. We find Judge Griffin's dissent most persuasive on this point wherein she stated:
Nor am I persuaded that the passage of the "Deferred Presentment Act" in October 2001 was intended by the legislature to confirm the prior legality of the practice. Indeed, it appears the legislation undertook to regulate and limit these schemes. Further, the statute appears to recognize that these transactions are, in fact, loans.
Ace Cash, 827 So.2d at 299 (Griffin, J., dissenting).

Conclusion
We conclude that deferred presentment transactions and rollovers were not contemplated in the original version of the Code. Absent an express legislative authorization for these types of transactions, the Department exceeded its authority in expanding the purpose and intent of the Code with the passage of rules interpreting *675 the Code to the contrary. At the time the transactions between Betts and NCA took place, the framework within which to consider their legality was the Usury Statute. Accordingly, it was error for the trial court to enter final summary judgment in favor of NCA on Betts's claims. This cause is reversed and remanded for further proceedings. We certify conflict with Ace Cash.
REVERSED AND REMANDED.
STONE and POLEN, JJ., concur.
NOTES
[1] See Betts v. Ace Cash Express, Inc., 827 So.2d 294 (Fla. 5th DCA 2002).
[2] The fee was 10% of the face amount of the check plus a $5 verification fee to cover the cost of verifying the financial information of the person cashing the check.
[3] A typical loan term will be two weeks, with the expiration date being on the customer's payday. For that reason, these transactions have come to be called "payday loans." See Drysdale & Krest, supra, at 600-01. It has been reported that "the average customer makes eleven transactions a year." Scott Andrew Schaaf, From Checks to Cash: The Regulation of the Payday Lending Industry, 5 N.C. Banking Inst. 339, 346 (2001).
[4] One author estimates that a $ 100 loan with a two-week loan term that is continually extended or rolled over could result in annual percentage rates ranging from 390% to 871%. See Drysdale & Krest, supra, at 602.
[5] The trial court was bound to follow the Fifth District's decision in Ace Cash. See generally Stanfill v. State, 384 So.2d 141, 143 (Fla. 1980) ("[t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by" the supreme court); Weiman v. McHaffie, 470 So.2d 682, 684 (Fla.1985) (stating, in the absence of interdistrict conflict, all Florida trial courts are bound by decisions of district courts); see also State v. Hayes, 333 So.2d 51, 53 (Fla. 4th DCA 1976) (holding that trial courts are bound to first follow decisions of the district court in the district where the court is located; alternatively, if "the only case on point on a district court level is from a district other than the one in which the trial court is located, the trial court [is] required to follow that decision").
[6] According to Black's Law Dictionary, this is considered "interest." See BLACK'S LAW DICTIONARY 812 (6th ed.1990) (defining "interest" in this context as the "cost of using credit or funds of another").