928 So.2d 1204 (2006)
McKENZIE CHECK ADVANCE OF FLORIDA, LLC., etc., et al., Petitioners,
v.
Wendy BETTS, etc., Respondent.
No. SC04-1825.
Supreme Court of Florida.
April 27, 2006.
Virginia B. Townes of Akerman, Senterfitt, Orlando, FL, and Mitchell Berger of Berger Singerman, Fort Lauderdale, FL, for Petitioner.
Christopher C. Casper of James Hoyer, Newcomer and Smiljanich, P.A., Tampa, FL, E. Clayton Yates of Yates and Mancini, *1205 LLC, Fort Pierce, FL, and Richard A. Fisher, Cleveland, TN, for Respondent.
Warren H. Husband and James R. Daughton, Jr. of Meetz, Hauser, Husband and Daughton, P.A., on behalf of the Community Financial Services Association of America and the Financial Service Centers of Florida, Inc.; and Lynn Drysdale of Jacksonville Area Legal Aid, Inc., Jacksonville, FL, and Deborah Zuckerman of AARP Foundation, Washington, D.C., on behalf of AARP, National Association of Consumer Advocates and National Consumer Law Center, for Amici Curiae.
ANSTEAD, J.
We have for review the decision in Betts v. McKenzie Check Advance of Florida, LLC, 879 So.2d 667 (Fla. 4th DCA 2004), which certified conflict with the decision in Betts v. Ace Cash Express, Inc., 827 So.2d 294 (Fla. 5th DCA 2002). We have jurisdiction. See art. V, § 3(b)(4), Fla. Const. The issue before this Court is whether chapter 560, Florida Statutes (Supp.1994), which is titled the "Money Transmitters' Code" (herein referred to as "the Code"), authorized certain financial transactions referred to as deferred presentment transactions. We approve the holding of the Fourth District in McKenzie that the Legislature did not approve or authorize such transactions when it created the Code in 1994 and that these transactions are, in effect, loans subject to Florida's usury laws.[1] We disapprove of the Fifth District's contrary holding in Ace Cash.

FACTS AND PROCEDURAL HISTORY
The factual transactions that gave rise to the present dispute are summarized in the Fourth District's opinion:
Betts's business relationship with NCA [National Cash Advance] began in August 1997 when she gave NCA two checks, each in the amount of $115. In return, she received $200 in cash and NCA's promise to defer presentment of the checks for a specified time. Approximately one week later, Betts redeemed the checks for cash. Less than one week later, Betts gave NCA three more checks, each for $115, in exchange for $300 and the same promise by NCA. Approximately two weeks later, Betts replaced the checks with three new checks, which she ultimately replaced with cash two weeks thereafter. A number of similar transactions subsequently took place, with Betts continuing to replace one check with another check, each time paying a fee, until December 1997 when she redeemed all checks with cash.
McKenzie, 879 So.2d at 668-69 (Fla. 4th DCA 2004) (footnote omitted). A similar, although not identical, set of circumstances was presented in Ace Cash, 827 So.2d at 294. Following a trial court decision against Betts based on the Fifth District's earlier decision in Ace Cash, the Fourth District reversed and held that the deferred payment transactions between Betts and NCA were essentially loan transactions and were not authorized with the Legislature's enactment of the Money Transmitters' Code in 1994. McKenzie, 879 So.2d at 674-75. The Fourth District decided that the short-term loan agreements entered into between Betts and NCA contrasted sharply with the check cashing transactions authorized by the Code:
There is no question that what takes place is something more than simple *1206 check cashing. In a deferred presentment transaction, the customer is advanced money in exchange for a check which the lender agrees not to immediately cash. In exchange for agreeing to defer presentment of the check, the lender exacts a fee. As Betts argues in this case, one might wonder why anyone would utilize the services of a "check casher" and pay for what he or she could otherwise obtain for free at a bank. Clearly, it is because the customer does not have the funds readily available to honor the check. Thus, there can be no question that what takes place is essentially an advance of money or a short-term loan.
McKenzie, 879 So.2d at 672. The Fourth District certified that its holding was in conflict with the Fifth District's holding in Ace Cash, and this review follows.

BACKGROUND
As outlined in the Fourth District's opinion, the Florida Legislature enacted the Money Transmitters' Code in 1994. This Code sought to regulate the practices of the money transmitter industry, including check cashing. The Code's definition of "money transmitter" referred to "any person located in or doing business in this state who acts as a payment instrument seller, foreign currency exchanger, check casher, or funds transmitter." § 560.103(10), Fla. Stat (Supp.1994). The Code defined "check casher" as "a person who, for compensation, sells currency in exchange for payment instruments received, except travelers checks and foreign-drawn payment instruments." § 560.103(3). "Sell" was defined as "to sell, issue, provide, or deliver." § 560.103(19). A "payment instrument" meant "a check, draft, warrant, money order, travelers check or other instrument or payment of money, whether or not negotiable." § 560.103(14). Moreover, "cashing" was defined as "providing currency for payment instruments, except for travelers checks and foreign-drawn payment instruments." § 560.302(1). Finally, the Department of Banking and Finance was charged with interpreting and enforcing the Code. §§ 560.102(1), 560.105.
The following year, on February 24, 1995, the Florida Check Cashiers Association (FCCA),[2] a group representing the Florida check cashing industry, solicited and received an informal opinion letter from the Department of Banking and Finance concerning certain deferred check cashing practices. The Department's letter stated that "Chapter 560, Florida Statutes, does not explicitly prohibit the concept of deferred deposits" so long as the service would be offered and managed in accordance with the provisions and fee caps of the Code.
Subsequently, on September 24, 1997, the Department adopted rules regulating check cashing transactions. These rules permitted a check casher to accept a postdated check,[3] and capped the transaction fees for such transactions at ten percent and the verification fees at five dollars. Fla. Admin. Code R. 3C-560.801 (transferred to R.69V-560.801), 3C-560.803 (repealed 2001), and 3C-560.905 (transferred to R.69V-560.905).
*1207 On May 5, 1998, the Department sent a letter to Advance America, Cash Advance Centers of Florida, Inc., regarding cashing checks, fees associated with deferred deposit checks, and rollover transactions of deferred deposit checks. This letter stated that customers cashing checks must receive currency, not another check or other type of payment instrument. In referencing deferred presentment transaction practices, the letter described the limitations on fees that can be charged by check cashers and explicitly referenced Florida's Usury Law in section 687.02, Florida Statutes (1997), stating that "it is illegal to charge a higher rate of interest than 18 percent per annum simple interest. Any `rollover,' `extension' or `renewal' of a deferred deposit check for an additional fee may constitute interest." In the final paragraph of the letter, the Department put Advance America on notice that the Department would fully enforce chapter 560 and that Advance America should "refrain from issuing payment instruments [for which it is] not properly licensed."
On May 1, 2000, the Florida Attorney General's Office issued an advisory legal opinion to the Comptroller of Florida in response to the question: "Are so-called `payday loans' or like transactions subject to the state laws prohibiting usurious rates of interest?" Op. Att'y Gen. Fla. 00-26 (2000). The opinion stated:
"Payday loans" or like transactions are subject to the state laws prohibiting usurious rates of interest. A company registered under Chapter 560, Florida Statutes, may cash personal checks for the fees prescribed in that chapter without violating the usury laws only if such transactions are concluded and are not extended, renewed or continued in any manner with the imposition of additional fees.
. . . .
Thus, to the extent that a transaction comports with the provisions of this act [chapter 560], it would not violate the usury provisions in Chapter 687, Florida Statutes. In the absence of statutory authorization for these types of transactions, cashing a check or exchanging currency for a fee outside the scope of Chapter 560, Florida Statutes, would constitute a loan, subject to the usury provisions of Chapter 687, Florida Statutes.
Op. Att'y Gen. Fla. 00-26 (2000).
In 2001, Betts filed an administrative challenge to Department rule 3C-560.803, Fla. Admin. Code, claiming that the rule, in seeming to authorize the acceptance of postdated checks by a check casher, was an invalid exercise of delegated legislative authority; furthermore, the rule improperly enlarged, modified, or contravened specific provisions of the Code it was meant to implement. After a hearing, an Administrative Law Judge (ALJ) upheld the rule, finding it did not enlarge, modify, or contravene the Code and it was a proper exercise of delegated legislative authority. Betts v. Dep't of Banking & Fin., No. 01-1445RX (Fla. DOAH order filed Sept. 7, 2001). However, the ALJ concluded that the Department's rule did not authorize deferred deposit transactions or the fees to be charged for such transactions. Id. The order stated that "[t]he Department has no rule, order, or declaratory statement authorizing deferred deposit transactions or repeated, consecutive deferred deposit transactions by a registered check casher." Id. at 11. Moreover, the order stated that "[t]he rule does not establish the fees nor does it authorize `rollover transactions' or `payday loans.'" Id. at 32.
In 2001, the Legislature amended the Code to expressly permit deferred presentment transactions subject to certain limitations and to prohibit rollover transactions. *1208 See Deferred Presentment Act, ch. 2001-119, § 13, Laws of Fla. (codified at §§ 560.401-.408, Fla. Stat. (2001)). A "deferred presentment transaction" is defined in the amendment as "providing currency or a payment instrument in exchange for a person's check and agreeing to hold that person's check for a period of time prior to presentment, deposit, or redemption." § 560.402(6). In the amended version of the statute, the Legislature expressly authorized deferred presentment transactions subject to the lender's compliance with strict record-keeping, notice, and Truth-in-Lending disclosure requirements. See § 560.404. The statute limits the face amount of the check taken for deferred presentment to not more than $500 and caps the fee for such transactions at ten percent. § 560.404(5)-(6). The statute expressly prohibits the post-dating of checks and any rollover or extension of a deferred presentment agreement. § 560.404(12), (14), (18).

ANALYSIS
We must decide whether the Legislature intended to include the deferred presentment transactions challenged by Betts when it enacted the Code in 1994. Like the Fourth District in McKenzie and the dissent in Ace Cash, we conclude that it did not. When reading all of the statute's terms together, we conclude that the Legislature contemplated a check casher to be a person or entity who may be compensated to provide currency in exchange for a check. We further conclude that the Legislature did not authorize deferred presentment transactions such as those involved herein until the passage of the Deferred Presentment Act in 2001. Hence, the transactions involved herein are subject to Florida usury laws. Our conclusion is based upon a plain reading of the language of the original version of the Code enacted in 1994 and a similar reading of the 2001 version of the Code, as well as the terms of Florida's usury laws.
When construing the meaning of a statute, we must first look at its plain language. Montgomery v. State, 897 So.2d 1282, 1285 (Fla.2005). Furthermore, "[w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." Id. (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984)).
Historically, transactions involving the lending of money for a fee or at a particular rate of interest have been governed by Florida's usury laws. See § 687.02(1), Fla. Stat. (1993) ("All contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious."). However, the Legislature from time to time has carved out exceptions to the usury laws. See, e.g., § 687.031, Fla. Stat. (1993) ("Sections 687.02 and 687.03 shall not be construed to repeal, modify or limit any or either of the special provisions of existing statutory law creating exceptions to the general law governing interest and usury and specifying the interest rates and charges which may be made pursuant to such exceptions. . . ."). We find no exception to these laws in the enactment of the Money Transmitters' Code in 1994.
When the Money Transmitters' Code was enacted in 1994, it defined a "money transmitter" as "any person located in or doing business in this state who acts as a payment instrument seller, foreign currency exchanger, check casher, or *1209 funds transmitter." § 560.103(10), Fla. Stat. (Supp.1994) (emphasis added). The Code defined "check casher" as "a person who, for compensation, sells currency in exchange for payment instruments received, except travelers checks and foreign-drawn payment instruments." § 560.103(3) (emphasis added). The term "sell" was defined as "to sell, issue, provide, or deliver." § 560.103(19). A "payment instrument" meant "a check, draft, warrant, money order, travelers check or other instrument or payment of money, whether or not negotiable." § 560.103(14) (emphasis added). Moreover, the term "cashing" was also defined in the Code as "providing currency for payment instruments, except for travelers checks and foreign-drawn payment instruments." § 560.302(1). The Code's language explicitly provides, by the use of "in exchange for" and "for," that the check for cash transaction would be a contemporaneous one. See §§ 560.103(3), 560.302(1). For example, the statute contemplates that a person may have to pay a fee for an authorized entity to cash a check, and the entity would then give the person money in exchange for the check. Therefore, we conclude the check cashing transaction contemplated by the Code is a straightforward payment of money in exchange for a check and not an authorization to process loans outside Florida's usury laws.
As noted above, the Code was amended by the passage of the Deferred Presentment Act in 2001. See §§ 560.401-.408, Fla. Stat. (2001). In the Deferred Presentment Act, a "deferred presentment transaction" was defined as "providing currency or a payment instrument in exchange for a person's check and agreeing to hold that person's check for a period of time prior to presentment, deposit, or redemption." § 560.402(6). Moreover, "rollover" was defined as "the termination or extension of an existing deferred presentment agreement by the payment of any additional fee and the continued holding of the check, or the substitution of a new check drawn by the drawer pursuant to a new deferred presentment agreement." § 560.402(8). Additionally, "termination of an existing deferred presentment agreement" was defined as:
[T]he check that is the basis for an agreement is redeemed by the drawer by payment in full in cash, or is deposited and the deferred presentment provider has evidence that such check has cleared. A verification of sufficient funds in the drawer's account by the deferred presentment provider shall not be sufficient evidence to deem the existing deferred deposit transaction to be terminated.
§ 560.402(10).
Importantly, Part IV of chapter 560, as amended in 2001, imposes strict requirements for deferred presentment transactions. Most relevant to the instant case is section 560.404(14), which states, "No deferred presentment provider or its affiliate may accept or hold an undated check or a check dated on a date other than the date on which the deferred presentment provider agreed to hold the check and signed the deferred presentment transaction agreement." Additionally, section 560.404(18) states:
No deferred presentment provider or its affiliate may engage in the rollover of any deferred presentment agreement. A deferred presentment provider shall not redeem, extend, or otherwise consolidate a deferred presentment agreement with the proceeds of another deferred presentment transaction made by the same or an affiliated deferred presentment provider.
Furthermore, section 560.404(19) provides:
A deferred presentment provider may not enter into a deferred presentment *1210 transaction with a person who has an outstanding deferred presentment transaction with that provider or with any other deferred presentment provider, or with a person whose previous deferred presentment transaction with that provider or with any other provider has been terminated for less than 24 hours.
Like the Fourth District in McKenzie and Judge Griffin's dissent in Ace Cash, we conclude that the Legislature did not intend for deferred presentment transactions to be covered under the Money Transmitters' Code until it expressly added the Deferred Presentment Act in 2001.
In fact, this reading of the plain language of the statute is well articulated in Judge Griffin's dissent in Ace Cash:
The fact that Chapter 560, which regulates check cashing operations, does not expressly prohibit rollovers and deferred presentments, does not mean that the usury laws are not violated by such devices. The legislature is to be forgiven for not having the foresight to prohibit or regulate the "uncashing" of a cashed check. Nor am I persuaded that the passage of the "Deferred Presentment Act" in October 2001 was intended by the legislature to confirm the prior legality of the practice. Indeed, it appears the legislation undertook to regulate and limit these schemes. Further, the statute appears to recognize that these transactions are, in fact, loans.
Ace Cash, 827 So.2d at 299 (Griffin, J., dissenting). We conclude that if the Legislature had intended to carve out such an important exception to the usury laws in 1994, it would have expressly done so, as it did with the 2001 amendment.
Sometimes it may be appropriate to consider a subsequent amendment to clarify original legislative intent of a statute if such amendment was enacted soon after a controversy regarding the statute's interpretation arose. Lowry v. Parole & Prob. Comm'n, 473 So.2d 1248, 1250 (Fla. 1985). However, the Fourth District decided that it is inappropriate to use an amendment for this purpose when the amendment was enacted seven years after the original statute. McKenzie, 879 So.2d at 674; see also Parole Comm'n v. Cooper, 701 So.2d 543, 544-45 (Fla.1997) (concluding that ten years is too long to be an affirmation of prior legislative intent). We agree.
In this case, the Legislature enacted the 2001 version of the Code seven years after the 1994 version. As with the ten-year gap in Cooper, we conclude that seven years is too long to view the amendment as merely a clarification of legislative intent. It is telling that nowhere within the original version of the Code did the Legislature mention these types of transactions. Moreover, the usury laws, which existed at the time the Code was enacted, have a general application to "[a]ll contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt." § 687.02, Fla. Stat. (1997). As a result, like the Fourth District and Judge Griffin, we conclude that the deferred deposit transactions involved herein are not "check cashing" transactions and are not governed by the Money Transmitters' Code enacted in 1994. Instead, these transactions are "contracts for the payment of interest upon any loan"[4] and subject to Florida's usury laws.
*1211 Finally, we find it persuasive that courts in other states have held that deferred presentment transactions are loans. See, e.g., Hamilton v. York, 987 F.Supp. 953, 956 (E.D.Ky.1997) (deciding that the deferred-repayment transactions "were nothing more than interest bearing loans"); Austin v. Alabama Check Cashers Ass'n, Nos. 1011907 & 1011930, ___ So.2d ___, ___, 2005 WL 3082884, at *21 (Ala. Nov.18, 2005) (concluding that deferred presentment transactions were loans subject to the Alabama Small Loan Act); White v. Check Holders, Inc., 996 S.W.2d 496, 500 (Ky.1999) (holding that the legislature did not intend for deferred deposit businesses to come under the law when it passed Kentucky Revised Statutes section 368.100(2) to allow check cashing businesses to charge fees without implicating usury laws).
The facts of the instant case are strikingly similar to those in White. In 1992, the Kentucky General Assembly enacted Kentucky Revised Statutes chapter 368, allowing check cashing businesses to charge a fee for cashing checks without implicating Kentucky's usury laws. White, 996 S.W.2d at 497. The transactions in that case involved the use of an order instrument "payable on demand and drawn on a bank" to evidence the promise of a debt due at a later time. Id. In White, the court addressed the following issue:
When a check cashing company licensed under KRS 368 et seq. accepts and defers deposit on a check pursuant to an agreement with the maker of the check, is the service fee charged by the check cashing company a "service fee" and not "interest" under KRS 368.100(2), or is the fee "interest" which is subject to the usury laws and disclosure provisions in KRS Chapter 360?
Id. The Kentucky Supreme Court held that the General Assembly did not intend for section 368.100(2) to encompass short-term loans based upon deferred deposit transactions as well as check cashing from current funds. Id. at 499. The Court decided that deferred deposit businesses did not come under the Code. Id. Furthermore, the Court noted that if the 1992 Act had applied to deferred deposit transactions, there would have been no need for the General Assembly to have amend the statute in 1998 to include these types of transactions. Id.

CONCLUSION
In conclusion, we hold that the original version of the Code did not include deferred presentment transactions. Therefore, at the time the transactions between Betts and NCA took place, the legality of such transactions was governed by Florida's usury laws. Accordingly, we approve the Fourth District's essential holding in McKenzie on this issue, and disapprove the Fifth's District decision in Ace Cash. We decline to consider other issues raised by the parties.
It is so ordered.
WELLS, LEWIS, QUINCE, and BELL, JJ., concur.
CANTERO, J., concurs in part and dissents in part with an opinion.
PARIENTE, C.J., recused.
CANTERO, J., concurring in part and dissenting in part.
Although the majority does not distinguish between pure deferred presentment transactions and rollover transactions, I see great differences between them. More importantly, so did the Department of Banking and Finance  the agency charged with implementing the statute we interpret. As I explain in more detail below, a deferred presentment transaction is one in which the check casher agrees not to *1212 "present" the customer's check to the bank until a later date; a rollover transaction is one in which the customer returns  sometimes more than once  and pays another fee to extend the period of deferment, usually by exchanging the previously "cashed" check for a new one. I agree with the majority that rollover transactions are essentially loans, and therefore are subject to the usury statute (this, incidentally, was also the Department's conclusion). I disagree, however, to the extent the majority holds that pure deferred presentment transactions are loans as well. Consistent with our many precedents deferring to an implementing agency's reasonable interpretation of a statute, I would defer to the Department, which concluded that the term "check cashing" includes deferred presentment transactions unless they involve a rollover for an additional fee. This interpretation reasonably clarifies a statutory ambiguity and falls squarely within the Department's area of expertise.

I. The Statutory Ambiguity
The issue in this case is whether the term "check cashing" in the Money Transmitters' Code  chapter 560, Florida Statutes (1997)  encompasses deferred presentment transactions. In a normal check-cashing transaction, the customer presents the check-cashing company with a check (sometimes a paycheck received that day), and in exchange receives cash. The majority finds nothing wrong with such transactions. Deferred presentment transactions are check-cashing transactions with a twist: like normal transactions, the customer receives cash in exchange for a check, but instead of having authority to cash the check immediately, the company, for a fee, agrees not to present the check to the bank for a specified period of time.[5]
Some deferred presentment transactions present yet another wrinkle: the customer enters into a so-called "rollover" transaction. These come in three main types: (1) the customer pays an additional fee in cash, and the check casher agrees to defer presentment for an even longer period; (2) the customer pays an additional fee and replaces the first check with a new one, presentment of which is also deferred; or (3) the customer redeems the earlier check with cash and then promptly writes a new check for deferred presentment, in exchange for which the cash  minus an additional fee  is returned. As scholars have noted, all of these rollovers achieve the same result: "a continuous flow of interest-only payments at very short intervals that never reduces the principal." Lynn Drysdale & Kathleen E. Keest, The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Role of Usury Laws in Today's Society, 51 S.C. L.Rev. 589, 601 (2000).[6]
Before 2001, when the Legislature passed the Deferred Presentment Act specifically addressing deferred presentment transactions, see ch. 2001-119, § 13, Laws of Fla., the Money Transmitters' Code did not mention them. It merely discussed check cashing in general, which it defined as "providing currency for payment instruments, except for travelers checks and foreign-drawn payment instruments." § 560.302(1), Fla. Stat. (1997). Thus, if deferred presentment transactions qualified *1213 as check cashing, they were subject to the Code's fee structure. See id. §§ 560.301-.310. If not, then they were effectively loans subject to Florida's longstanding usury laws. See id. § 687.02(1) ("All contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious.").[7]
The majority concludes from the plain language of the Code that all deferred presentment transactions  whether completed or rolled over  fall outside the definition of "check cashing." Majority op. at 1209-10, 1211. According to the majority, they are simply disguised loans that must comply with the usury laws. Id. at 1211. I beg to differ. I do not agree that all deferred payment transactions are the same. To the contrary, as I explain below, the agency charged with implementing the Code has reasonably interpreted it as including pure deferred presentment transactions but excluding rollovers. I would defer to the agency's interpretation.

II. The Agency's Interpretation
The agency with "general regulatory powers" under the Money Transmitters' Code is the Department of Banking and Finance, which has express statutory authority "to issue and publish rules . . . to interpret and implement the provisions of the code," as well as the "discretion to effectuate the purposes, policies, and provisions of the code." § 560.105(3), Fla. Stat. (1997). This authority, however, is limited. The Department may exercise "[o]nly such rulemaking power and administrative discretion . . . as is necessary, in order that the supervision and regulation of money transmitters may be flexible and readily responsive to changes in economic conditions, in technology, and in money transmitter practices." Id. § 560.102(2)(h).
On many occasions, the Department exercised its authority by evaluating whether the Code authorized deferred presentment transactions. First, in February 1995, the Department wrote to Florida's check-cashing association stating that it saw "no reason to object" to deferred presentment transactions, provided that they adhered to the Code's fee limitations for check-cashing transactions. See Letter from Jeffrey D. Jones, Asst. Gen. Counsel, Office of Comptroller, to Larry F. Lang, President, Fla. Check Cashiers Ass'n, Inc., at 1 (Feb. 24, 1995). The letter cautioned, however, that it was "not a rule, declaratory statement or final order," but rather an informal opinion by which the Department would not consider itself bound. Id.
In September 1997, the Department promulgated a formal rule addressing deferred presentment transactions. The rule provided that "[a] check casher may accept a postdated check, subject to the fees established in Section 560.309(4), F.S." Fla. Admin. Code R. 3C-560.803 (1997). As a logical corollary, the rule also allowed the check casher to wait until the specified date to cash the check. This is because the customer has the ability, by notifying the bank in writing of the postdated check, to prevent it from being cashed early. § 655.86, Fla. Stat. (1997). Unless the Department intended for check cashers to *1214 accept postdated checks without ever cashing them, which seems absurd, it must have intended to allow deferred presentment of postdated checks.
The majority dismisses the rule because none of the respondent's transactions involved a postdated check; all of her checks were presently dated. But that is too formalist a reading of the rule. No functional difference exists between a postdated check and a presently dated check whose presentment is deferred. In one case, the agreement to defer is noted on the check itself; in the other, it is contained in a separate document. The agreements are effectively the same. Thus, the most logical reading of the Department's rule is that check cashing encompasses transactions in which the check casher waits for an agreed-upon period before cashing the customer's check. See Betts v. McKenzie Check Advance of Fla., LLC, 879 So.2d 667, 671 (Fla. 4th DCA 2004) (stating that the rule "expressly approved deferred presentment transactions subject to certain restrictions").
Even if the rule did leave some ambiguity, however, it was clarified a few months later. In a letter of advice to Florida check cashers in May 1998, the Department explained, as the rule implied, that deferred presentment transactions were subject to the Code's check-cashing fee structure. But the Department cautioned that when a deferred presentment transaction is rolled over, extended, or renewed for an additional fee, the additional fee may constitute excessive interest under the usury laws. See Letter from Wm. Douglas Johnson, Asst. Dir., Div. of Banking, Dep't of Banking and Fin., to Billy Webster, President/CEO, Advance Am. Cash Advance Ctrs. of Fla., Inc., at 1 (May 5, 1998). In other words, a deferred presentment transaction only counts as check cashing when it is consummated by the actual cashing of the check or cash redemption.
Two years later, the Department asked the Attorney General for his opinion on the matter. We have long recognized that "[a]lthough an opinion of the Attorney General is not binding on a court, it is entitled to careful consideration and generally should be regarded as highly persuasive." State v. Family Bank of Hallandale, 623 So.2d 474, 478 (Fla.1993). Reaching the same conclusion as the Department, the Attorney General opined that a check casher registered under the Code "may cash personal checks for the fees prescribed in [the Code] without violating the usury laws only if such transactions are concluded and are not extended, renewed or continued in any manner with the imposition of additional fees." Op. Atty. Gen. Fla. 00-26 (2000).
Finally, in April 2001, the respondent challenged the Department's rule in an administrative proceeding. The administrative law judge dismissed her petition, explaining that nothing in the Code "prohibits the check casher from holding the customer's check for an agreed-upon period of time." Betts v. Dep't of Banking & Fin., No. 01-1445RX at 27 (Fla. Div. Admin. Hearings Sept. 7, 2001). While acknowledging that the Department's rule "provides more details than the statute," the judge concluded that it "does not enlarge, modify or contravene the language it seeks to interpret." Id. at 30. Accordingly, the judge upheld the rule as a reasonable implementation of the statute. The respondent did not appeal. Shortly thereafter, in light of the 2001 amendments to the Code, the rule was repealed.[8]
*1215 In summary, the Department has consistently interpreted the Code's term "check cashing" as including deferred presentment transactions unless they involve a rollover, extension, or renewal for an additional fee. This policy was stated informally in 1995 (one year after the Code's enactment), was formalized into a rule in 1997, was further explained in a formal letter in 1998, was embraced by the Attorney General in 2000, and finally was upheld by an administrative law judge in 2001, just before the Code was amended. The interpretations were consistent. Some of the transactions in this case occurred in 1997, the year before the Department made its position absolutely clear in the formal letter. But the letter did not represent a change in Department policy. It merely confirmed the Department's consistent position, as already expressed (less clearly) in the informal opinion and the formal rule.
We have not required that, to be entitled to deference, an agency's statutory interpretation be exhaustively articulated in a formal rule. To the contrary, we have deferred to a rule supported by an affidavit from an agency official who attested after the fact that the Department of Revenue had "consistently maintained [a] policy" since the inception of a given tax. Dep't of Revenue v. First Union Nat'l Bank of Fla., 513 So.2d 114, 119 (Fla. 1987). Thus, when we have reliable evidence that the implementing agency maintained a consistent interpretation of its statute during the time the statute was in effect  as is the case here  that interpretation should be followed if it meets the requirements for administrative deference. I now address that issue.

III. The Doctrine of Administrative Deference
We have long recognized that "the contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." Gay v. Canada Dry Bottling Co. of Fla., 59 So.2d 788, 790 (Fla.1952) (quoting Coca-Cola Co. v. State Bd. of Equalization, 25 Cal.2d 918, 156 P.2d 1, 2 (1945)). Stated positively, this doctrine means that "a reviewing court must defer to an agency's interpretation of an operable statute as long as that interpretation is consistent with legislative intent and is supported by substantial, competent evidence." Pub. Employees Relations Comm'n v. Dade County Police Benevolent Ass'n, 467 So.2d 987, 989 (Fla.1985).
Courts defer to the implementing agency out of respect for the institutional competence and expertise of agencies charged with implementing legislation. Agencies have more expertise about matters within their jurisdiction than courts, which consider a wide variety of issues. While the courts always remain the final authority on the interpretation of statutes  an authority that, under the separation of powers in the Florida Constitution, no Legislature may remove  we certainly can benefit from an agency's unique combination of technical knowledge and practical experience. The Legislature, by authorizing an agency to implement a statute, encourages us to "accord[ ] considerable persuasive force" to the agency's judgments. State ex *1216 rel. Szabo Food Servs., Inc. of N.C. v. Dickinson, 286 So.2d 529, 531 (Fla.1973). We have done just that. Under our precedents, "deference usually will be accorded an administrative agency's interpretation of matters entrusted by statute to its discretion or expertise." Palm Harbor Special Fire Control Dist. v. Kelly, 516 So.2d 249, 250 (Fla.1987) (citing Pub. Employees, 467 So.2d at 987, and Daniel v. Fla. State Tpk. Auth., 213 So.2d 585 (Fla.1968)).[9]
Although we occasionally depart from agency interpretations, it is only "for the most cogent reasons." Fidelity Constr. Co. v. Arthur J. Collins & Son, Inc., 130 So.2d 612, 613 (Fla.1961) (citing Gay, 59 So.2d at 790). We do not defer to an agency's interpretation that attempts "to enlarge, modify, or contravene a statute." Campus Commc'ns, Inc. v. Dep't of Revenue, 473 So.2d 1290, 1296 (Fla.1985) (internal quotation marks omitted). The Administrative Procedure Act, not to mention the separation of powers, prohibits such actions. See § 120.52(8)(c), Fla. Stat. (2005) (stating that a rule is invalid if it "enlarges, modifies, or contravenes the specific provisions of law implemented"). We also do not defer to an agency when it "exceeds its authority" by "act[ing] outside the scope of its powers and jurisdiction." Level 3 Commc'ns, LLC v. Jacobs, 841 So.2d 447, 450 (Fla.2003). Only the agency charged with implementing the statute is entitled to our deference, and only when acting as the Legislature authorized it to act.
But for these narrow exceptions, however, we defer to the implementing agency's interpretation of the statute. The majority gives no hint that these exceptional circumstances are present in this case. As I explain below, they are not.

IV. Deferring to the Agency in this Case
As I mentioned, the Department of Banking and Finance is the agency charged with enforcing and interpreting the Money Transmitters' Code. The Department interpreted the Code's term "check cashing" to include some, but not all, deferred presentment transactions. Under the doctrine of administrative deference, we must defer to this interpretation as long as it is within the scope of the Department's authority and is consistent with the statute. I address each requirement separately.
The Department's interpretation falls within its scope of authority to implement the Code. The statute provides that the Department may exercise "[o]nly such rulemaking power and administrative discretion. . . as is necessary, in order that the supervision and regulation of money transmitters may be flexible and readily responsive to changes in economic conditions, in technology, and in money transmitter practices." § 560.102(2)(h), Fla. Stat. (1997). Here, the Department's interpretation surely meets that test of necessity. After the Code was enacted, the check-cashing industry asked the Department to explain whether check cashing included deferred presentment transactions. These transactions were very similar to ordinary check cashing, but involved the additional element of delay in cashing the check. For the regulation of money *1217 transmitters to remain "flexible and readily responsive to changes . . . in money transmitter practices," id., the Department absolutely needed to determine whether deferred presentment transactions qualified as check cashing. These were precisely the circumstances in which the Legislature intended for the Department to exercise its authority.
The other factor in deciding whether to defer to the Department is whether its interpretation enlarged, modified, or contravened the statute. It did none of those things. Rather, it reasonably clarified a statutory ambiguity. The Code contained only general references to check cashing, which it defined as "providing currency for payment instruments." Id. § 560.302(1). At the time, the Code did not mention deferred presentment transactions. Such transactions, however, possess all the attributes of check cashing mentioned in the Code: the customer receives currency in exchange for a payment instrument (albeit one that will not be presented until a later date). The Department, faced with this ambiguity, interpreted check cashing to include deferred presentment transactions, except if they result in a rollover for an additional fee.
Where a statute is silent, we have traditionally allowed agencies to determine how a general statutory directive should be applied to specific circumstances. As we explained in General Telephone Co. of Florida v. Marks, 500 So.2d 142 (Fla.1986): "The legislature cannot be expected to foresee and make provision for every possible type of [situation]. . . . Some discretion must be given to regulatory bodies to promulgate the detailed rules that expand upon and implement legislative directives." Id. at 145. In Marks, the Legislature had stated in general terms that the agency could make a certain calculation. We explained that "[u]nless there is something else directly contrary in the statute itself, we must assume the legislature intended to grant the commission the discretion to determine what factors should be used in calculating [the figure]." Id. We have continued to apply this logic in more recent cases. See, e.g., Level 3 Commc'ns, 841 So.2d at 453-54 (quoting Marks). We should apply it in this case as well, where the Department applied a general statutory provision to specific facts.
While not the only plausible reading of the Code, the Department's interpretation is the most natural one. Check cashing is designed to place currency in the customer's hands faster than otherwise feasible, in exchange for a fee that compensates the check casher for its efforts and assumption of risk. See Michael S. Barr, Banking the Poor, 21 Yale J. on Reg. 121, 142, 145 (2004) (explaining that check cashers mostly accept "low-risk payroll or government benefit checks" from customers who lack a bank account or who "find that they lack sufficient liquidity to wait the two-to-three days for their bank to clear access to funds from a deposited check"). In an ordinary check-cashing transaction, the check casher may present the check as soon as possible. But nothing in the statute dictates when the check must be cashed or prohibits the parties from negotiating on that point. A deferred presentment transaction merely lengthens the time between the customer's receipt of currency and the company's cashing of the check. As long as the check casher ultimately presents the check to a bank at the end of the deferral period, or at least receives full payment in cash from the customer, the transaction remains so similar to ordinary check cashing that the most sensible reading of the statute is to treat them the same.
When a customer instead returns to the check casher and rolls over the initial *1218 transaction, paying another fee to extend the period for actual payment, the transaction looks less like check cashing and more like a traditional loan. The Department sensibly concluded that rollover transactions  however styled or disguised  go beyond mere check cashing and cannot be squeezed within the Code. Instead, they must adhere to the interest restrictions established by the usury statute. This distinction between completed transactions and rollovers is so persuasive that I would adopt it even on de novo review. That it comes directly from the statute's implementing agency clinches the matter. At the very least, the Department's interpretation deserves our deference. To the extent the majority refuses to defer, I respectfully dissent.
NOTES
[1] We decline to address the issue of whether National Cash Advance (NCA) is entitled to the protection of the safe harbor provision, section 560.107, Florida Statutes (Supp. 1994).
[2] The Florida Check Cashiers Association is now known as Financial Service Centers of Florida, Inc.
[3] Florida Administrative Code Rule 3C-560.803 provided, "A check casher may accept a postdated check, subject to the fees established in Section 560.309(4), F.S." This rule only permitted postdated checks in check cashing transactions. Because there were no postdated checks in this case, we need not address the issue of whether the Department had the authority to promulgate this rule.
[4] At oral argument, McKenzie's counsel conceded that these transactions were "a species of loans" and "a form of a loan."
[5] These deferred presentment transactions are sometimes called "payday loans," "cash advance loans," "delayed deposit transactions," or "postdated check loans," among other things.
[6] The petitioner in this case stopped engaging in rollover transactions (at least the first and second types) in 1998, when the Department expressly stated in a letter of advice that such transactions constituted usurious loans.
[7] As one district court has noted, "[t]he usury statutes were in existence at the time Chapter 560 was created and the legislature must be presumed to have been aware of them when it enacted legislation allowing the transactions to take place." Fastfunding the Co. v. Betts, 852 So.2d 353, 355 (Fla. 5th DCA 2003). Thus, a transaction that complies with the Code "should not be deemed to be in violation of Florida's usury laws." Id.
[8] Before the statutory amendment, the Department was considering a proposed rule that would have expressly stated that "[a]ny agreement to extend, renew or continue a check cashing transaction in any manner, including the substitution of a new check drawn by the drawer, if coupled with the imposition of any fees, compensation, or any other benefit, is outside the scope of [the Code]." 27 Fla. Admin. Weekly 651-52 (Feb. 16, 2001). In light of the statutory amendments, the proposal was withdrawn. 27 Fla. Admin. Weekly 2841 (June 15, 2001).
[9] Florida is by no means unique in deferring to agency interpretations of a statute the agency is charged with implementing. Both the federal courts, see Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the vast majority of states share these principles. See, e.g., Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st Cir.2002) (noting that "most states . . . give[ ] some deference to the reasonable interpretation of a state statute by the state administrative agency charged with the responsibility of enforcing that statute").